[No. S006813. Dec. 3, 1990.]

SCREEN EXTRAS GUILD, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
BARBARA SMITH, Real Party in Interest.

■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**COUNSEL**

Gilbert & Sackman, Steven J. Kaplan and Robert W. Gilbert for Petitioners.

Schwartz, Steinsapir, Dohrmann & Sommers, Michael D. Four and Henry M. Willis as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Joseph Posner for Real Party in Interest.

**OPINION**

**PANELLI, J.**—A woman employed by a labor union as a business agent, not herself a member of the union, was discharged, allegedly for dishonesty and for insubordination. She sued the union and its executive secretary for wrongful discharge in breach of an employment contract, intentional and negligent infliction of emotional distress, and defamation. The union moved for summary judgment on the ground that these claims were preempted by federal labor law. The trial court denied the motion; the Court of Appeal denied a petition for mandate. We granted review to consider the preemption issue.

The Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 United States Code sections 401-531, mandates that labor unions be democratically governed. Democratic union governance dictates that elected union officials be responsive to the will of their union membership-electorate. To effectuate this policy, elected union officials have the authority to discharge union employees in management or policymaking positions who do not, in their opinion, serve the union membership properly. Permitting former union employees who held management or policymaking positions to bring state actions against the unions which employed them, or against the officials of such unions, premised on their discharge,

would undermine the ability of elected union leaders to effectuate the will and policies of the union membership they represent. Thus, the strong federal policy favoring union democracy, embodied in the LMRDA, preempts state causes of action for wrongful discharge or related torts when brought against a union-employer by its former management or policymaking employee. Accordingly, we reverse the Court of Appeal.

## I.

### FACTS AND PROCEEDINGS BELOW

The undisputed facts are as follows:

The Screen Extras Guild (SEG) is a labor union comprised of motion-picture extra players and is governed by a constitution and bylaws. The governing body of SEG is the board of directors (Board), which is elected by and from the SEG membership by secret ballot. Power to hire and discharge paid business representatives is vested solely with the Board.

Barbara Smith (Smith) was employed by the SEG as a business agent from 1978 until she was discharged in 1986.[1] Her job responsibilities included handling SEG members' claims, filing claims and grievances by SEG members against the studios that employed them, settling wage claims, settling grievances, and granting waivers of certain terms of the collective bargaining agreement between SEG and various motion picture studios. Smith was considered a management employee.

Neva Brown (Brown) was the national executive secretary (NES) of SEG when Smith was discharged. The NES is the chief administrative officer of SEG. The NES, appointed by a majority vote of the Board, is authorized to recommend to the Board the appointment and removal of SEG employees, including SEG business agents. At a special Board meeting in June 1986, Brown read a statement criticizing Smith's past job performance and recommended that Smith not be retained. This recommendation was accepted, and Smith was thereafter terminated by the Board.

Smith sued SEG for wrongful discharge in breach of the covenant of good faith and fair dealing. She also sued both SEG and Brown (collective-

---

[1] The Court of Appeal observed that a material issue of fact may have existed as to whether Smith was fired after having taken an approved two-month leave of absence, or whether she was refused employment after she in effect voluntarily resigned by taking advantage of a special "temporary retirement" benefit then permitted by the rules of the Motion Picture Industry Pension Plan, in which she participated. For the purposes of SEG's motion for summary judgment, however, both parties, the trial court, and the Court of Appeal assumed Smith was discharged. We will do likewise.

ly, the defendants) for intentional and negligent infliction of emotional distress and defamation. The defendants moved for summary judgment on the ground that Smith's claims were preempted by the LMRDA. The trial court denied the motion. The Court of Appeal summarily denied writ review. We granted the defendants' petition for review and transferred the matter to the Court of Appeal with directions to issue an alternative writ. The Court of Appeal issued and ultimately discharged the alternative writ, denying the petition for a writ of mandate. We granted review to decide whether a union business agent's claims for wrongful discharge and related torts against the union and its officials are preempted by the LMRDA.

## II.

### DISCUSSION

A state action is preempted wherever it " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (U.S. Const., art. VI, cl. 2; *Brown* v. *Hotel Employees* (1984) 468 U.S. 491, 501 [82 L.Ed.2d 373, 383, 104 S.Ct. 3179], quoting *Hines* v. *Davidowitz* (1941) 312 U.S. 52, 67 [85 L.Ed. 581, 587, 61 S.Ct. 399].)[2]

Preemption cases may be divided into two types: substantive or jurisdictional.[3] Substantive preemption is based on federal protection of conduct that state law attempts to regulate or penalize. (*Railroad Trainmen* v. *Terminal Co.* (1969) 394 U.S. 369, 383, fn. 19 [22 L.Ed.2d 344, 357, 89 S.Ct. 1109].) Jurisdictional preemption is based on protecting the primary jurisdiction, within a particular sphere of conduct, of federal regulatory bodies. (*Ibid.*) Both kinds of preemption advance congressional purposes, but "[s]ince congressional purposes can be either substantive or jurisdictional, a state action may be struck down as an invalid interference with the federal design either because it is in actual conflict with the substantive operation of

[2] Justice Arabian's dissent merely iterates the truism that "[p]reemption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons . . . .' " (See dis. opn. of Arabian, J., *post*, at p. 1042, quoting *Chicago & N. W. Tr. Co.* v. *Kalo Brick & Tile Co.* (1981) 450 U.S. 311, 317 [67 L.Ed.2d 258, 264-265, 101 S.Ct. 1124].) As will become apparent, we find the reasons for application of preemption in this case amply persuasive.

[3] Preemption cases, of course, may be subject to classification in a variety of ways. The substantive/jurisdictional distinction, which classifies according to the type of interest being protected, is only one of several possible taxonomies. We have no quarrel with Justice Arabian's observation that "[t]raditionally, the United States Supreme Court has grouped and analyzed preemption cases in three categories [i.e., express preemption, implied preemption, and 'conflict' preemption]" (dis. opn. of Arabian, J., *post*, at p. 1039). (See also Tribe, American Constitutional Law (2d ed. 1988) § 6-25, p. 481, fn. 14.) We decline to enter into a controversy with Justice Arabian as to which scheme for classification of preemption cases is most elegant. As Justice Arabian correctly observes, "[w]hile analytically useful, these divisions are not rigidly distinct." (Dis. opn. of Arabian, J., *post*, at p. 1039, fn. 1.)

a federal program, or because, whatever its substantive impact, it intrudes upon a field that Congress has validly reserved to the federal sphere [of regulation]." (Tribe, American Constitutional Law, *supra*, § 6-25 at p. 481.)

The two types of preemption are analyzed differently. ■ Jurisdictional preemption involves balancing the competing federal and state interests at stake. In such cases, the magnitude of especially deep-rooted local interests underlying particular state causes of action may outweigh any resulting interference with federal jurisdiction. (See, e.g., *Operating Engineers* v. *Jones* (1983) 460 U.S. 669, 683 [75 L.Ed.2d 368, 380, 103 S.Ct. 1453].)

On the other hand, if state law regulates conduct that is actually protected by federal law, preemption follows not as a matter of protecting the primary jurisdiction of federal regulatory bodies, but as a matter of substantive right. Where the issue is one of substantive conflict with federal law, "[t]he relative importance to the State of its own law is not material . . . for the Framers of our Constitution provided that the federal law must prevail." (*Brown* v. *Hotel Employees, supra*, 468 U.S. at p. 503 [82 L.Ed.2d at p. 384], citing *Free* v. *Bland* (1962) 369 U.S. 663, 666 [8 L.Ed.2d 180, 183, 82 S.Ct. 1089].) In such cases, state action is preempted, without balancing state and federal interests, by direct operation of the supremacy clause of the United States Constitution. (U.S. Const., art. VI, cl. 2; *Brown* v. *Hotel Employees, supra*, 468 U.S. at p. 501 [82 L.Ed.2d at p. 383].)

This case is not one involving jurisdictional preemption, as Smith's claims do not implicate the jurisdiction of federal regulatory bodies. Therefore, addressing the substantive preemption issues in this case, our task is simply to determine whether there is an actual conflict between permitting Smith to pursue her state law causes of action and federal labor policy as embodied in the LMRDA. (*Brown* v. *Hotel Employees, supra*, 468 U.S. at p. 503 [82 L.Ed.2d at p. 384].)[4]

■ State law is unquestionably preempted where a valid "act of Congress fairly interpreted is in actual conflict with the law of the State." (*Savage* v. *Jones* (1912) 225 U.S. 501, 533 [56 L.Ed. 1182, 1195, 32 S.Ct.

---

[4] We note Justice Arabian's acknowledgement, consistent with our substantive/jurisdictional categorization, that "[a] distinction has been made . . . between preemption based on federal protection of the conduct in question and that based on the need to protect the primary jurisdiction of the National Labor Relations Board." (Dis. opn. of Arabian, J., *post*, at p. 1040.) Justice Arabian, ultimately, does not appear to quarrel with our conclusion that this case is *not* one involving jurisdictional preemption and that, therefore, the proper inquiry is to determine whether permitting Smith's state cause of action "actually conflicts" with "accomplishment and execution of the full purposes and objectives of Congress" (*Hines* v. *Davidowitz, supra*, 312 U.S. at p. 67 [85 L.Ed. at p. 587]) as embodied in the LMRDA. (See dis. opn. of Arabian, J., *post*, at pp. 1040-1041.)

715] [dictum]; see also *Florida Avocado Growers* v. *Paul* (1963) 373 U.S. 132, 142-143 [10 L.Ed.2d 248, 256-257, 83 S.Ct. 1210] [dictum]; *McDermott* v. *Wisconsin* (1913) 228 U.S. 115, 132-133 [57 L.Ed. 754, 766, 33 S.Ct. 431].) Justice Arabian's dissent acknowledges that while state laws that are merely in general tension with broad and abstract goals of federal legislation may not be preempted (see *Commonwealth Edison Co.* v. *Montana* (1981) 453 U.S. 609, 633 [69 L.Ed.2d 884, 904-905, 101 S.Ct. 2946]; Tribe, American Constitutional Law, *supra*, § 6-26 at p. 487), "state law may be preempted under a conflict analysis if it frustrates the specific objectives underlying a federal enactment . . . ." (See dis. opn. of Arabian, J., *post*, at p. 1042.) The "actual conflict" versus "general tension" inquiry focuses on whether the purportedly conflicting federal interest is sufficiently well defined and rooted in federal enactments to give rise to preemption. (See, e.g., *Exxon Corp.* v. *Governor of Maryland* (1978) 437 U.S. 117, 129-133 [57 L.Ed.2d 91, 102-105, 98 S.Ct. 2207] [broad implications of Sherman Act and Robinson-Patman Act insufficient reasons for preempting Maryland Motor Fuel Inspection Law].)

As discussed below, under the facts of this case, we believe that there is an actual conflict between the state wrongful discharge action advanced by Smith and the policies underlying the LMRDA.

A. *Wrongful Discharge.*

■   For the reasons hereinafter stated, we conclude that the LMRDA preempts Smith's action for wrongful discharge against SEG. In our view, to allow such actions to be brought by former confidential or policymaking employees of labor unions would be inconsistent with the objectives of the LMRDA and with the strong federal policy favoring union democracy that it embodies.

The LMRDA was the product of congressional concern over abuses of power by union leadership. Inter alia, it regulates union trusteeships and elections. Title I of the LMRDA, introduced under the title of "Bill of Rights of Members of Labor Organizations" (29 U.S.C. §§ 411-415), guarantees certain rights to union members, emphasizing those having to do with freedom of expression.   ■   The primary objective of the LMRDA, however, is to ensure that unions are democratically governed and responsive to the will of their memberships. (*Finnegan* v. *Leu* (1982) 456 U.S. 431, 435-436 [72 L.Ed.2d 239, 243-244, 102 S.Ct. 1867].)

Elected union officials must necessarily rely on their appointed representatives to carry out their programs and policies. As a result, courts have recognized that the ability of elected union officials to select their own

administrators is an integral part of ensuring that union administrations are responsive to the will of union members. (*Finnegan* v. *Leu, Supra,* 456 U.S. at p. 441 [72 L.Ed.2d at p. 247]; *Bloom* v. *General Truck Drivers* (9th Cir. 1986) 783 F.2d 1356, 1361; *Tyra* v. *Kearney* (1984) 153 Cal.App.3d 921, 926 [200 Cal.Rptr. 716]; *Montoya* v. *Local Union III of I.B.E.W.* (Colo.Ct.App. 1988) 755 P.2d 1221, 1224.)

In *Finnegan* v. *Leu, supra,* 456 U.S. 431 [72 L.Ed.2d 239], union business agents, who were also union members, were discharged from their appointed positions by the union president following his election over a candidate supported by these business agents. They claimed that their discharge violated the "Bill of Rights" sections of the LMRDA. The United States Supreme Court upheld their discharge. The court held that while the LMRDA generally protects union members' rights of expression by limiting retaliatory discharges, it does not restrict the freedom of an elected union leader to choose staff members with views compatible to his own. (*Finnegan, supra,* 456 U.S. at pp. 440-442 [72 L.Ed.2d at pp. 246-248].) In reaching this conclusion, the high court held, contrary to Justice Eagleson's apparent view (see dis. opn. of Eagleson, J., *post,* at p. 1034), that the primary objective of the LMRDA is to ensure union democracy. (*Finnegan, supra,* 456 U.S. at pp. 435-436 [72 L.Ed.2d at pp. 243-244].) The court found that, in view of this objective, Congress must have intended that elected union officials would retain unrestricted freedom to select business agents, or, conversely, to discharge business agents with whom they felt unable to work or who were not in accord with their policies. (*Id.* at p. 442 [72 L.Ed.2d at p. 248].)

In *Bloom* v. *General Truck Drivers, supra,* 783 F.2d 1356, a business agent sued the union that formerly employed him for wrongful discharge, alleging he had been fired for refusing to falsify minutes of an executive board meeting which authorized the expenditure of funds. Although the Ninth Circuit found that the business agent's action was not preempted by the LMRDA,[5] the court affirmed, on other grounds, a summary judgment

---

[5] As we have explained (*ante,* at p. 1023), only in cases of jurisdictional preemption should a court conduct a balancing of federal interests against state interests. The *Bloom* court, while acknowledging that preemption was a complex and difficult area of the law, failed to distinguish between substantive and jurisdictional preemption. Accordingly, the court improperly assumed that the question of LMRDA preemption "require[s] us to balance state and federal interests, although the relative importance attached to each interest is unclear." (*Bloom, supra,* 783 F.2d at p. 1360, fn. omitted.) Using a balancing approach, the court concluded that, since the case before it involved a discharge allegedly in retaliation for refusal to violate a state criminal statute, the federal interest in promoting union democracy was very weak, so as to be outweighed by the strong state interest in enforcing its criminal laws. (*Id.* at p. 1362.) The court distinguished *Finnegan* v. *Leu, supra,* and *Tyra* v. *Kearney, supra,* on the grounds

in favor of the union.[6] The court said the agent had failed to raise a genuine issue of material fact on the issue of the cause of his discharge, because he conceded that the firing took place in the context of his political rivalry with the union leadership and before he refused to falsify the minutes. (*Bloom, supra,* 783 F.2d at p. 1363.) In reaching this conclusion, the court observed that "[t]he federal interest in promoting union democracy and the rights of union members, therefore, includes an interest in allowing union leaders to discharge incumbent administrators." (*Bloom, supra,* 783 F.2d at pp. 1361-1362.)[7]

In *Tyra* v. *Kearney, supra,* 153 Cal.App.3d 921, Jean Tyra (Tyra), a union business agent, had challenged the incumbent secretary/treasurer in a union election. The incumbent was reelected and thereafter terminated Tyra's employment. The trial court determined that Tyra's subsequent claim for wrongful discharge was preempted by federal labor law. The Court of Appeal affirmed, holding that replacement of business agents by elected union officials is sanctioned by the LMRDA, and that to allow Tyra's wrongful discharge claim would interfere with the effective administration of national labor policy. (*Tyra* v. *Kearney, supra,* 153 Cal.App.3d at pp. 922-923; see also *Montoya* v. *Local Union III of I.B.E.W., supra,* 755

---

that "the discharge of the employee [in those cases] was central to the concern of federal labor policy, and a state cause of action would have interfered with the federal regulatory scheme." (*Bloom, supra,* at p. 1362.)

We need not speculate as to whether the *Bloom* court reached the right conclusion regarding LMRDA preemption, despite what we believe to be its use of an inappropriate type of preemption analysis. We observe only that the court was of the opinion that "[t]he kind of discharge alleged, retaliation for refusal to commit a crime and breach a trust, is not the kind sanctioned by the [LMRDA], or by the courts in *Finnegan* and *Tyra.*" (*Bloom, supra,* at p. 1362.) This suggests that, had the court employed the "actual conflict" type of preemption analysis called for in these types of cases (*Brown* v. *Hotel Employees, supra,* 468 U.S. at p. 503 [82 L.Ed.2d at p. 384]), it would not have found a conflict with the LMRDA and thus would have reached the same result.

[6] The *Bloom* court's holding that the business agent's action was not preempted by the LMRDA was limited to a consideration of the agent's allegations that his discharge was in retaliation for his refusal to commit a crime. The court was careful to note "[that] [w]e need not decide, however, whether allowing a state cause of action for wrongful discharge would generally undermine [the] federal interest and rob the union leaders of discretion needed to serve the wishes of the membership and thus the purposes of the [LMRDA]." (*Bloom, supra,* at p. 1362.)

[7] Unlike *Bloom,* the case before us *does not* involve a discharge claim based on an employee's unwillingness to violate or conceal a violation of a criminal statute. *Bloom* found an exception to LMRDA preemption in such circumstances. (See also *Montoya* v. *Local Union III of I.B.E.W., supra,* 755 P.2d at p. 1224.) In *Montoya, supra,* the Colorado Court of Appeals reversed a summary judgment dismissing an assistant union business manager's state law action for wrongful discharge. In doing so, the court stated, "We adopt the rationale of *Tyra* v. *Kearney, supra,* and hold that the plaintiff's . . . claims . . . are preempted by federal law, except insofar as the *Bloom* exception applies." (*Ibid.*) Because the court below had not considered whether the *Bloom* exception might apply, the *Montoya* court remanded the matter for further consideration. (*Ibid.*)

P.2d at p. 1224 [following *Tyra*].) We are persuaded that the same reasoning should be applied in this case.

■■■ The core of Smith's claim for wrongful discharge is that SEG discharged her in violation of the covenant of good faith and fair dealing in the employment contract between them. Absent federal preemption, California law provides a cause of action for wrongful discharge in violation of the covenant of good faith and fair dealing in an employment contract. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 700 [254 Cal.Rptr. 211, 765 P.2d 373] [limiting the availability of tort remedies].)

Smith does not dispute that she was discharged by elected union officials. She argues instead that because her discharge by the Board was based on her alleged incompetence and dishonesty, and not on the basis of her disagreement with the policy goals of the elected officials of SEG, her claims do not implicate the LMRDA or its concerns about union democracy. The Court of Appeal, agreeing with Smith, and seeking to distinguish her case from that of the plaintiff in *Tyra* v. *Kearney, supra,* 153 Cal.App.3d 921, reasoned that "[u]nion officials are not elected to breach contracts or commit torts and, if they do so, the fact they are 'democratically elected' is beside the point. This case has nothing to do with union democracy . . . . This is a garden-variety 'wrongful termination' case which just happens to be brought against a union . . . ." While this argument may have superficial appeal, it lacks merit in practice. Such a holding goes beyond the *Bloom* exception (*supra,* 783 F.2d 1356) and is inconsistent with the cases which permit union leaders to discharge incumbent administrators. As Justice Eagleson acknowledges, the attempt to decide whether particular wrongful discharge claims do or do not implicate the LMRDA is unworkable in the real world. (See dis. opn. of Eagleson, J., *post,* at p. 1036, fn. 2.)

In our view, allowing even "garden-variety" wrongful termination actions to proceed from the discharge of *appointed* union business agents by *elected* union officials would implicate the union democracy concerns of the LMRDA. "Replacement of business agents by an elected labor union official is sanctioned by the [LMRDA] and allowance of a claim under state law would interfere with the effective administration of national labor policy." (*Tyra* v. *Kearney, supra,* 153 Cal.App.3d at p. 923.)

The separation of wrongful discharge allegations into those which involve terminations for policy reasons and those which involve only "garden-variety" terminations ultimately rests upon highly subjective determinations. Smith, according to the Court of Appeal, was terminated because the Board believed she had been inefficient or dishonest in performing her duties— allegations which the Court of Appeal calls "garden variety." But how are

we to distinguish that kind of discharge from one where it is alleged that a confidential or policymaking employee worked inefficiently or dishonestly in response to, or created obstacles to the implementation of, union policies, adopted by elected union officials, which he or she opposed? If a business agent, for example, were discharged for failing to efficiently adopt a new set of procedures for prioritizing routine tasks which had been endorsed by elected officials, should that be characterized as a termination to facilitate policy, or as a "garden-variety" termination for inefficiency?

It is probably impossible to elaborate reliable objective indicators of the two theoretical types of discharges that creative lawyers will not be able to subvert. And obviously, every wrongful discharge claim brought against a union by a business agent will be cast in "garden-variety" terms if that is all it takes to survive preemption. Consequently, the attempt to distinguish the two types of claims at the summary judgment stage, as the Court of Appeal has done here, would require courts to make almost wholly subjective determinations. Because of the subjective nature of these determinations, many suits premised on discharges which are in fact policy based would nevertheless be permitted to proceed to trial.

The expense of litigating wrongful discharge claims, as well as the risk of liability should a discharge ultimately be deemed "garden variety," would surely have a chilling effect on all discharges. But, as we have seen, Congress intends that elected union officials shall be free to discharge management or policymaking personnel. Thus, allowing such claims to proceed in the California courts would "restrict the exercise of the right to terminate which *Finnegan* found [to be] 'an integral part of ensuring a union administration's responsiveness to the mandate of the union election.'" (*Tyra* v. *Kearney, supra*, 153 Cal.App.3d at p. 927, citing *Finnegan* v. *Leu, supra*, 456 U.S. at p. 441 [72 L.Ed.2d at p. 247].)

Consequently, while the Court of Appeal thought it important for the purposes of preemption analysis to distinguish between claims against a union that relate to the purposes of the LMRDA and claims that are routine disputes between an employer and employee, the reverse is actually the case. It is important *not* to base a preemption rule on such a subjective distinction. To do so would permit wrongful discharge claims against unions by business agents that would inhibit the ability of elected union officials to freely choose their staffs and would thus impermissibly frustrate full realization of the goals of the LMRDA. (See *Montoya* v. *Local Union III of I.B.E.W., supra*, 755 P.2d at p. 1223.)

The Court of Appeal also sought to distinguish this case from *Tyra* v. *Kearney, supra*, 153 Cal.App.3d 921, on the ground that Smith's discharge

did not occur in the immediate aftermath of a union election. However, neither *Tyra* nor *Finnegan* v. *Leu, supra*, 456 U.S. 431 [72 L.Ed.2d 239], upon which the *Tyra* court based its holding, nor *Bloom* (*supra*, 783 F.2d 1356) nor *Montoya*, which found an exception to *Finnegan* and *Tyra*, supports the idea that the freedom of elected union officials to choose their own staff exists only during some undefined period of time following union elections. Though *Tyra* involved a recently elected secretary/treasurer, and *Finnegan* involved a recently elected union president, there is nothing in the words or reasoning of either opinion to suggest that federal labor policy would have been found less protective of the discharges upheld in those cases if they had occurred later in the administrations of the respective union officials involved.[8] *Montoya, supra*, stressed that in that case, as here, "the union's bylaws (and its constitution) provided that the [elected] business manager had the authority to hire and fire its representatives and assistants *at any time*." (*Montoya* v. *Local Union III of I.B.E.W., supra*, 755 P.2d at p. 1224 [italics added].)

*Tyra* v. *Kearney, supra*, 153 Cal.App.3d 921, and *Finnegan* v. *Leu, supra*, 456 U.S. 431 [72 L.Ed.2d 239], are both based on the realization that policymaking and confidential staff are in a position to thwart the implementation of policies and programs advanced by elected union officials and thus frustrate the ability of the elected officials to carry out the mandate of their election. (See *Sheet Metal Workers* v. *Lynn* (1989) 488 U.S. 347, 354 [102 L.Ed.2d 700, 709, 109 S.Ct. 639] [explaining *Finnegan*].)[9] Although it

[8] Nor is it important that Smith was discharged by a board of directors upon the recommendation of an appointed official, rather than directly by a union president, as was the plaintiff in *Finnegan*. The SEG Board members were democratically elected by vote of the union membership. Federal labor law protects the freedom of all democratically elected union leaders to choose staff with views compatible to their own. (*Finnegan* v. *Leu, supra*, 456 U.S. 431, 441 [72 L.Ed.2d at p. 247].) The discharge upheld in *Tyra*, for example, was effected by the secretary/treasurer of the union involved. (*Tyra* v. *Kearney, supra*, 153 Cal.App.3d at p. 922.)

[9] In *Sheet Metal Workers*, the high court affirmed a Ninth Circuit ruling that *Finnegan*'s principle of preserving an elected union official's prerogative to discharge policymaking subordinates did not control where the discharged employee was himself an *elected* official discharged in retaliation for exercising a right expressly protected by the LMRDA. (*Sheet Metal Workers* v. *Lynn, supra*, 488 U.S. 347, 355-358 [102 L.Ed.2d 700, 710-712].)

Justice Arabian incorrectly characterizes *Sheet Metal Workers* as making "the distinction between a union official's exercise of union patronage, and his or her power to hire and fire as an ordinary employer . . . ." (See dis. opn. of Arabian, J., *post*, at p. 1048.) In support of this characterization, Justice Arabian says that the *Sheet Metal Workers* "court carefully examined the purposes of the LMRDA, and determined that this discharge did not promote the purpose of 'union democracy.' " (See dis. opn. of Arabian, J., *post*, at p. 1048.) The plaintiff in *Sheet Metal Workers*, however, brought suit in federal court under section 102 of the LMRDA. (*Sheet Metal Workers, supra*, 488 U.S. at p. 350 [102 L.Ed.2d at p. 707].) He did not bring a suit for wrongful discharge under state law. *Sheet Metal Workers* is *not* a preemp-

may be true that conflicts between elected officials and previously appointed staff most frequently surface soon after new officials are elected, the potential for a staff member to impede implementation of union officials' programs does not automatically decrease or evaporate with the passage of time. The recency of the union elections in *Finnegan* and *Tyra* simply has no bearing on the applicability of those cases to this one.

As noted in *Finnegan*, the ability to freely select policymaking subordinates is an "integral part of ensuring a union administration's responsiveness to the mandate of the union election." (*Finnegan* v. *Leu, supra*, 456 U.S. at p. 441 [72 L.Ed.2d at p. 247].) To allow a state claim for wrongful discharge to proceed from the termination of a union business agent by elected union officials would interfere with the ability of such officials to implement the will of the union members they represent. This would frustrate full realization of the goal of union democracy embodied by the LMRDA, in contravention of the supremacy clause. (U.S. Const., art. VI, cl. 2; *Brown* v. *Hotel Employees, supra*, 468 U.S. at p. 501 [82 L.Ed.2d at p. 383].) Consequently, the LMRDA and the supremacy clause preempt wrongful discharge claims brought against labor unions or their officials by former policymaking or confidential employees.

As we have previously noted, the preemptive effect of the LMRDA upon Smith's wrongful discharge claim is substantive, not jurisdictional. (*Ante*, at p. 1023.) Smith was not and is not a member of the SEG. ■ Only union members are expressly protected by the provisions of the LMRDA. (*Bloom* v. *General Truck Drivers, supra*, 783 F.2d at p. 1361.) Thus, the LMRDA does not, by its terms, apply to Smith, and she does not enjoy the guaranties of its "Bill of Rights of Members of Labor Organizations" (29 U.S.C. §§ 411-415), previously mentioned.[10] ■ Smith's cause of action is

tion case. In fact, we have searched the text of that opinion and are unable to find any reference either to preemption or to *any* state cause of action at all.

In reality, though express provisions of the LMRDA operated to invalidate the discharge disputed in *Sheet Metal Workers*, the high court in that case stressed the link first articulated in *Finnegan* between an elected union official's freedom to discharge subordinate employees and the attainment of union democracy, noting that "[i]n *Finnegan*, this goal was furthered when the newly elected union president discharged the appointed staff of the ousted incumbent. Indeed, the basis for the *Finnegan* holding was the recognition that the newly elected president's victory might be rendered meaningless if a disloyal staff were able to thwart the implementation of his programs." (*Sheet Metal Workers* v. *Lynn, supra*, 488 U.S. at pp. 354-355 [102 L.Ed.2d at p. 709].

[10] Nor are Smith's state causes of action saved from preemption by three clauses of the LMRDA which deal with the preemptive effect of that act. Title 29 United States Code section 413 ("Nothing contained in this subchapter shall limit the rights and remedies of any member of a labor organization under any State or Federal law . . . .") and 29 United States Code section 523(a) (". . . nothing in this chapter shall take away any right or bar any remedy to which members of a labor organization are entitled under . . . Federal law or law of any State.") save only causes of action enjoyed by union members. (*Bloom* v. *General Truck Drivers, supra*, 783 F.2d at p. 1360.) Just as Smith is not entitled to the substantive protec-

preempted substantively because such suits pose " '. . . an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' " (*Brown* v. *Hotel Employees, supra,* 468 U.S. at p. 501 [82 L.Ed.2d at p. 383]) in enacting the LMRDA.

The Court of Appeal declared that there was "no showing that [Smith] had anything to do with establishing union policy or that her firing had anything to do with her views on union policy." This raises the question whether Smith's wrongful discharge claim falls within the preempted class of claims described above.

Smith, as a union business agent with significant decisionmaking responsibility for the implementation of SEG policies and their application to individual cases, was among that group of policymaking or confidential employees the selection of which federal labor policy leaves to the unfettered discretion of elected union officials.

Union business agents "have significant responsibility for the day-to-day conduct of union affairs." (*Finnegan* v. *Leu, supra,* 456 U.S. at pp. 441-442 [72 L.Ed.2d at pp. 247-248]; *Bloom* v. *General Truck Drivers, supra,* 783 F.2d at p. 1357.) Business representatives are expressly recognized in the LMRDA to be "key administrative personnel" (29 U.S.C. § 402(q)) who "occupy positions of trust in relation to [labor] organization[s] and [their] members as a group." (29 U.S.C. § 501(a).)

Functionally, the business agent is at the forefront of implementing union policy, linking the union member and the upper echelons of the union bureaucracy. It is the business agent who responds to workers' grievances and who often selects which ones to pursue. The business agent makes strategic decisions regarding pursuit of collective bargaining and is frequently the chief organizer of strikes. The business agent is charged with seeing that the union contract is enforced and makes a number of discretionary decisions in that regard. (See Kennedy et al., The Business Agent and His Union (U.C. Berkeley Institute of Industrial Relations, 2d ed. 1964) pp. 35-51.) Smith, for example, could decide to waive certain union rules in the case of some employers. In short, for many union members, the business agent *is* the union, the chief representative of union policies. (*Ibid.*)

Smith herself acknowledges, as did the Court of Appeal, that she was considered a management employee. Even her "limited discretion to settle claims and waive certain provisions of the union contract with signatory

---

tions of the LMRDA, she cannot enjoy its savings clauses. (*Ibid.*) Title 29 United States Code section 524 saves only state criminal laws and thus cannot save Smith's civil action. (*Ibid.*)

employers" distinguishes her from "rank-and-file" union employees. (See *Finnegan* v. *Leu, supra,* 456 U.S. 442, 443 [72 L.Ed.2d at p. 248] (conc. opn. of Blackmun, J.).)

For the foregoing reasons, we hold that former union business agent Smith's action for wrongful discharge against her former union-employer, SEG, is preempted by the LMRDA and the strong federal policy favoring union democracy it embodies.[11]

### B. *Smith's Other Claims.*

■ Smith sued Brown, as well as SEG, for infliction of emotional distress and defamation. We believe that the result as to Brown must be the same as to SEG. These claims are simply Smith's wrongful termination claim in other garb. The facts Smith alleged to underlie these causes of action are essentially the same as those which underlie her action for wrongful discharge (i.e., the fact and circumstances of her discharge). Smith alleges no significant additional tortious activity on the part of Brown or SEG.[12]

We look to the substance of the claim, not its characterization, to determine whether an action is preempted by federal labor law. (*DeTomaso* v. *Pan American World Airways, Inc.* (1987) 43 Cal.3d 517, 527 [235 Cal.Rptr. 292, 733 P.2d 614], cert. denied 484 U.S. 829 [98 L.Ed.2d 60, 108 S.Ct. 100], citing *Andrews* v. *Louisville & Nashville R. Co.* (1972) 406 U.S. 320 [32 L.Ed.2d 95, 92 S.Ct. 1562].) Because Smith's claimed damages for infliction of emotional distress and from defamation all flow from her allegedly wrongful dismissal, these causes of action are barred by the LMRDA for the same reasons that her cause of action for wrongful discharge is barred. (*Ibid.*) We need not, and do not, decide whether the same would have been the case if, in connection with the emotional distress and defamation causes of action, significant additional tortious activity had been alleged against SEG or Brown.

We recognize that our holding has the inevitable consequence of denying to Smith, and to other potential plaintiffs in similar circumstances, a reme-

---

[11] We leave open the question whether a different result might obtain in a case involving nonpolicymaking and nonconfidential employees. (See *Finnegan* v. *Leu, supra,* 456 U.S. at p. 441, fn. 11 [72 L.Ed.2d at p. 247].)

[12] Smith does not allege conduct on the part of SEG officials "so outrageous that 'no reasonable [person] in a civilized society should be expected to endure it' " (*Farmer* v. *Carpenters* (1977) 430 U.S. 290, 302 [51 L.Ed.2d 338, 351, 97 S.Ct. 1056] [no preemption of emotional distress claim alleging threats and intimidation causing emotional distress resulting in bodily injury]). Our decision today, of course, should not be read to suggest that causes of action for defamation or for intentional infliction of emotional distress are automatically preempted along with wrongful discharge claims when a discharge is accompanied by such conduct.

dy which is otherwise available to some classes of employees in this state. However, in enacting the LMRDA, "Congress simply was not concerned with perpetuating appointed union employees in office at the expense of an elected president's freedom to choose his own staff." (*Finnegan* v. *Leu, supra,* 456 U.S. at p. 442 [72 L.Ed.2d at p. 248].) We are thus compelled to recognize that "the wide scope of federal regulation of labor unions does not permit [the] application [of all of California wrongful discharge law] to employees of unions." (*Tyra* v. *Kearney, supra,* 153 Cal.App.3d 921, 927 (conc. opn. of Crosby, J.).)

## III.

### DISPOSITION

The judgment of the Court of Appeal is reversed. The cause is remanded to the Court of Appeal with directions to issue a writ of mandate directing the trial court to enter summary judgment for the defendants as to all causes of action.

Lucas, C. J., Mosk, J., and Kennard, J., concurred.

**EAGLESON, J.**—I respectfully dissent. In my view, the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA) (29 U.S.C. § 401 et seq.) does not preempt a union employee's California claim for wrongful discharge and related torts, even where union politics or patronage may be involved. The LMRDA expressly preserves state-law rights and remedies that do not frustrate its purposes. The United States Supreme Court decisions cited by the majority do not state or imply that the LMRDA preempts state-law wrongful-discharge claims. And nothing in California's carefully circumscribed law of wrongful termination is inconsistent with the LMRDA's goals and objectives.

Though they differ on the semantic nuances of preemption analysis, Justice Arabian in his dissent (*post*) and the majority agree in principle about several theories of preemption that *are not* applicable here. First, as both concede, the LMRDA does not expressly preempt state-law suits for wrongful discharge by a union employee. (*Shaw* v. *Delta Air Lines, Inc.* (1983) 463 U.S. 85, 95-100 [77 L.Ed.2d 490, 499-503, 103 S.Ct. 2890].) The federal statute contains no preemption clause at all.

Second, the LMRDA does not imply an intent to displace state regulation of the subject matter it addresses. (*Rice* v. *Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [91 L.Ed. 1447, 1459, 67 S.Ct. 1146].) Indeed, the statute includes several provisions indicating its *nonpreemptive* intent. (See,

in particular, 29 U.S.C. §§ 413 [LMRDA does not limit other remedies of union members under state or federal law or union constitution and by-laws], 523(a) [preserving all "responsibilities" of union officials, and all remedies of union members, under other federal and state laws].)

Third, state regulation of conduct even "arguably protected or prohibited" by the LMRDA would not interfere with the primary jurisdiction of a federal agency. (*San Diego Unions* v. *Garmon* (1959) 359 U.S. 236, 244-245 [3 L.Ed.2d 775, 782-783, 79 S.Ct. 773].)

Fourth, California's enforcement of a union employee's wrongful-discharge rights would not preclude compliance with the requirements of the LMRDA. (*Florida Avocado Growers* v. *Paul* (1963) 373 U.S. 132, 142-143 [10 L.Ed.2d 248, 256-257, 83 S.Ct. 1210].)

Justice Arabian and the majority focus instead on a fifth, more nebulous theory of preemption. This holds that preemption of a particular state law, right, or remedy is implied if application of the state's policy "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (E.g., *Brown* v. *Hotel Employees* (1984) 468 U.S. 491, 501 [82 L.Ed.2d 373, 383, 104 S.Ct. 3179]; *Hines* v. *Davidowitz* (1941) 312 U.S. 52, 67 [85 L.Ed. 581, 586-587, 61 S.Ct. 399].) The majority say the LMRDA establishes a broad policy of "democratic union government" that "actually protects" the near-absolute right of elected union officials to fire appointed staff aides at will. Justice Arabian concedes a more limited federal protection of "patronage" or "political" discharges. I find neither premise persuasive.

The LMRDA was a limited response to antidemocratic abuses by union leaders *against the membership.* By its terms, the statute places certain reporting requirements on unions and unionized employers; imposes standards for union financial transactions, elections, and trusteeships; and includes a "Bill of Rights" for union members. (29 U.S.C. § 411 et seq.) The statute was undoubtedly intended to discourage corrupt and arbitrary union governance, but it did not attack that problem by addressing the relationship between elected union officials and *appointed employees* of the union.

Cases concluding that the "democratic" policies of the LMRDA protect a union's relations with its high-level appointees from state regulation all rely primarily on *Finnegan* v. *Leu* (1982) 456 U.S. 431 [72 L.Ed.2d 239, 102 S.Ct. 1867] (hereafter *Finnegan*). However, *Finnegan* is not a preemption case. It holds only that an appointed union employee has no wrongful-discharge remedy *under the LMRDA.* Neither *Finnegan* nor any other United States Supreme Court decision has intimated that the LMRDA has

a preemptive effect on *state-law* protections against wrongful discharge from employment.

Several lower-court decisions have found varying degrees of implicit preemption in *Finnegan's* suggestion that the freedom of an elected union officer to maintain a politically compatible staff is "an integral part" of the responsive union democracy which is the "overriding objective" of the LMRDA. (456 U.S. at p. 441 [72 L.Ed.2d at p. 247]; see, e.g., *Bloom* v. *General Truck Drivers* (9th Cir. 1986) 783 F.2d 1356, 1361-1363; *Tyra* v. *Kearney* (1984) 153 Cal.App.3d 921, 925-926 [200 Cal.Rptr. 716]; *Montoya* v. *Local Union III of I.B.E.W.* (Colo.Ct.App. 1988) 755 P.2d 1221, 1224.) However, by taking *Finnegan's* analysis out of context, these courts accord it too broad a meaning. My colleagues perpetuate the error here.

In *Finnegan*, a newly elected union president fired business agents who, as members of the union, had campaigned for the incumbent. The agents claimed the discharges were a prohibited form of "discipline" (29 U.S.C. § 529 [LMRDA, tit. VI, § 609]) for their exercise of *membership* political rights guaranteed by section 101(a)(1) and (2) of title I of the LMRDA. (29 U.S.C. § 411(a)(1), (2).) The court answered that the LMRDA does not protect a union member's status as an employee of the union, so as to "*restrict* the freedom of an elected union leader to choose a staff whose views are compatible with his own. [Fn. omitted.]" (*Finnegan, supra*, 456 U.S. at pp. 440-441 [72 L.Ed.2d at p. 247], italics added.) This "ability of an elected union president to select his own administrators," said the court, is *consistent* with the "overriding" federal goal of union governments which are responsive to popular will. (*Ibid.*)

*Finnegan* did not suggest, however, that the LMRDA *protects or guarantees* such freedom against all regulation by the states. On the contrary, the opinion concluded that the LMRDA simply has no effect on the "traditional" and "longstanding" employment practices of unions as set forth in their constitutions and bylaws. (456 U.S. at pp. 441-442, & fn. 12 [72 L.Ed.2d at pp. 247-248].) As the court observed, "*neither the language nor the legislative history of the [LMRDA] suggests that it was intended even to address the issue of union patronage. [Fn. omitted.]* . . . [¶] . . . Nothing in the [LMRDA] evinces a congressional intent to *alter the traditional pattern* which would permit a [newly elected] union president *under [the] circumstances [presented by this case]* to appoint agents of his choice to carry out his policies." (*Id.*, at pp. 441-442 [72 L.Ed.2d at pp. 247-248], italics added.)

*Finnegan* suggested at most that the "traditional" plenary patronage power of elected union officials over appointed aides often promotes union democracy, and does not violate the LMRDA. There was no inference that

the LMRDA mandates at-will employment for high-level union aides, even where the union itself has decided in good faith to offer more secure employment. Nor did the court imply that state enforcement of good-faith employment agreements between unions and their high-level employees would frustrate or obstruct federal goals.[1]

*Sheet Metal Workers* v. *Lynn* (1989) 488 U.S. 347 [102 L.Ed.2d 700, 109 S.Ct. 639] adds nothing of significance to an argument for preemption. Like *Finnegan*, *Lynn* was solely concerned with an *employee-member's* rights and remedies under *federal* law. *Lynn* held that when an *elected* union official is dismissed for expressing his views to his fellow members, he *may* state a free-speech claim *under the LMRDA*. In the *Lynn* majority's view, the chilling effect of such a dismissal on the LMRDA's "basic objective" of responsive union democracy outweighed the usual federal policy of deference to union employment practices. (488 U.S. at pp. 353-355 [102 L.Ed.2d at pp. 708-710].) In effect, *Lynn* limits any implication in *Finnegan* that the sanctity of union employment practices is a federal policy which takes precedence over individual rights.

Justice Arabian correctly observes that "although state law may be preempted . . . if it frustrates the specific objectives underlying a federal enactment, a 'general tension' with the broad or abstract goals of federal laws or programs will not result in preemption. (See *Commonwealth Edison Co.* v. *Montana* (1981) 453 U.S. 609, 633-634 [69 L.Ed.2d 884, 904-905, 101 S.Ct. 2946].) . . . [S]tate law should not be displaced unless there is a significant conflict between the operation of the local law and concretely identifiable federal interests. (*Boyle* v. *United Technologies Corp.* (1988) 487 U.S. 500 [101 L.Ed.2d 442, 108 S.Ct. 2510].)" (Dis. opn. of Arabian, J., *post*, at pp. 1042-1043.) The majority agree in principle, and that concession should be dispositive. Though the LMRDA takes some steps designed to encourage democracy in unions, it simply does not embrace unfettered union patronage as a "concretely identifiable" means of achieving that abstract goal.[2]

---

[1] I am not persuaded otherwise by footnote 12 of *Finnegan*. There the court proposed that if Congress had contemplated interfering with union patronage, the unions' "substantial resistance" would likely have produced "some express accommodation to the needs of union employers to appoint and remove policymaking officials . . . ." (456 U.S. at p. 441 [72 L.Ed.2d at p. 247].) I read this passage only as emphasizing that in its actual form, the LMRDA was not intended to regulate such practices.

[2] Contrary to the majority, Justice Arabian suggests that we can distinguish between "garden-variety" and "patronage" discharges, deeming only the former to be within the preemptive concerns of the LMRDA. (Dis. opn. of Arabian, J., *post*, at pp. 1048-1055; see also *Bloom* v. *General Truck Drivers, supra*, 783 F.2d at pp. 1361-1363.) Even the majority imply that the LMRDA may not preempt claims based on fundamental state statutory policies. (Maj. opn., *ante*, at p. 1026, fns. 6 & 7.) I am not persuaded. As the majority suggest, the true motives for a discharge are often obscure and indirect. That leaves room for artful drafting of

In any event, California employment law does not interfere or conflict with any legitimate federal interest in the freedom of elected union officials to choose their own aides. In California, the employment relationship is *presumptively* "at-will." (Lab. Code, § 2922.) Our state provides a remedy for discharge from employment only if the termination contravened a valid express or implied agreement for job security (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 677 [254 Cal.Rptr. 211, 765 P.2d 373]), stemmed from a pernicious form of discrimination (e.g., Gov. Code, § 12940 et seq.), or violated some other clear and fundamental public policy (*Foley, supra*, at pp. 665-670; *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 172-179 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314]).

*Finnegan* may well have been correct in its assertion that patronage is a wise and important traditional component of democratic union government. If so, high-level union appointees like Barbara Smith, the complainant in this case, will be hard pressed to prove in California that they had express or implied guarantees against arbitrary removal. Where, as here, only an implied contract is alleged, crucial considerations include " 'the personnel policies or practices of the employer . . . and the practices of the industry in which the employee is engaged.' . . ." (*Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d at p. 680, quoting *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 327 [171 Cal.Rptr. 917].) Thus, long service, regular raises, and consistent praise from supervisors will not prove an implied contract where all parties must reasonably have understood that the particular relationship was personal, confidential, and subject to discretionary termination.[3]

On the other hand, a particular union might decide in good faith that it wishes to abandon at-will employment, and to develop some form of express or implied "merit" system for its high-level appointees. If it accomplishes that goal by appropriate means, I see absolutely nothing in federal policy which would prevent state enforcement of the remedies thereby created.[4]

complaints, and for endless litigation about the "real" reasons why a particular employee was fired.

[3] Even where the claim is based on an express oral or written agreement, the employee cannot prevail under state contract law where there was no actual or apparent authority for the promise. When an organization's leaders are democratically elected for fixed terms, their promises to high-level subordinates, unless made in compliance with authority granted by the membership, may well not be binding on their successors in office. (Cf. *Burke* v. *Bevona* (2d Cir. 1989) 866 F.2d 532, 537.)

[4] In this case, the union also claims the LMRDA furthers the right guaranteed workers by section 7 of the National Labor Relations Act (NLRA) (29 U.S.C. § 141 et seq.) to "bargain collectively through representatives of their own choosing." (29 U.S.C. § 157; see also 29 U.S.C. § 401 [LMRDA, § 2].) This right, the union observes, includes the workers' "full freedom," unhindered by local regulation, to select the officials and agents through whom the chosen representative acts. (*Hill* v. *Florida* (1945) 325 U.S. 538, 541 [89 L.Ed. 1782, 1784, 65

For all these reasons, I can accept neither the majority's analysis nor Justice Arabian's. I find no preemption, and I would disapprove the Court of Appeal's holding in *Tyra* v. *Kearney, supra*, 153 Cal.App.3d 921, to the extent it suggests the contrary. For this reason, and because I cannot say on the record before us that Smith's claims are absolutely precluded as a matter of state law,[5] I would affirm the judgment of the Court of Appeal.

Broussard, J., concurred.

ARABIAN, J., Dissenting.—The majority opinion is, as Churchill once said of Russia, "a riddle wrapped in a mystery inside an enigma." The majority proposes to hold that the wrongful discharge claims of plaintiff and real party in interest (hereafter plaintiff) conflict with, and are therefore preempted by, the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA or Act), 29 United States Code section 401 et seq. The riddle is to understand how a statute designed to hold union leaders accountable for their actions and to safeguard workers' rights can be twisted to strip workers of all means of legal redress for employment abuses. The mystery lies in discerning the majority's analytic route to this bizarre result. The ultimate enigma, of course, is the fact that the case presents no actual conflict between state and federal law. Nothing in the LMRDA compels or even contemplates the unjust result reached in the majority opinion. Accordingly, I respectfully dissent.

---

S.Ct. 1373], but see *Brown* v. *Hotel Employees, supra*, 468 U.S. 491, 509 [82 L.Ed.2d at p. 388].) Thus, the union concludes, one elected by the members to conduct the union's affairs inherits their "full" and unhindered freedom to hire and fire subordinate agents. However, in the exercise of its "full freedom," the membership can decide, or designate representatives to decide, what personnel practices the union will employ. Often the choice will be that subordinate agents should serve solely at the pleasure of the elected leadership. On the other hand, if the union's rules or policies, validly adopted, create state-law expectations of more secure employment, I see nothing in section 7 of the NLRA that precludes resort to appropriate state remedies.

[5] Smith makes the usual claims of longevity, salary increases, and praise for her performance. As noted above, however, these factors may have little bearing on reasonable expectations in democratically governed organizations such as unions. Of greater interest are the union's constitution, bylaws, and published personnel policies. Smith's removal was accomplished, as the union constitution and bylaws require, by a majority vote of the elected board of directors. (Art. V, § 7(b).) The union's personnel manual, however, contains conflicting statements of the circumstances under which removal of an appointed employee may occur. Article IX, titled "Termination," declares that "[t]he Guild may terminate employment at will" and that "[t]he employer expressly has not granted any employee any vested right or contract as to any guarantee or length of employment." However, article VIII, titled "Job Performance," provides that when an employee's performance is considered "below standard," he or she is entitled to warning and a "reasonable opportunity for correction;" if "no improvement is [thereafter] noted," the national executive secretary may recommend to the board that the employee be dismissed. Smith asserts she received no adequate warning of perceived deficiencies. Moreover, there appears to be a dispute whether Smith was fired, or whether she simply was not rehired after taking temporary "retirement."

DISCUSSION

I. *Preemption Doctrine*

Traditionally, the United States Supreme Court has grouped and analyzed preemption cases in three categories. (See, e.g., *English* v. *General Electric Company* (1990) 495 U.S. __, __ [110 L.Ed.2d 65, 110 S.Ct. 2270].)

First, Congress may expressly define the extent to which its enactments will preempt state law ("express" preemption).

Second, in the absence of an express declaration, state law may be preempted where it is apparent that Congress intended the federal government to occupy the field exclusively ("field" or "implied" preemption). "Field" preemption may be inferred where the scheme of federal regulation is so pervasive that it evinces an intent that the states should have no room to regulate, or where the federal interest in the area of concern is so dominant that states will be deemed precluded from enforcing state laws on the same subject. (See *Rice* v. *Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [91 L.Ed. 1447, 1459, 67 S.Ct. 1146].)

Third, state law may be preempted to the extent that it actually conflicts with federal law ("conflict" preemption). Actual conflict with federal law may be found where it is impossible to comply with both the federal and the state law (*Florida Avocado Growers* v. *Paul* (1963) 373 U.S. 132, 142-143 [10 L.Ed.2d 248, 256-257, 83 S.Ct. 1210]), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (*Hines* v. *Davidowitz* (1941) 312 U.S. 52, 67 [85 L.Ed. 581, 587, 61 S.Ct. 399].)[1]

Rather than analyze the case in these traditional preemption terms, the majority focuses on an ill-defined and nebulous alternative scheme—"jurisdictional" and "substantive" preemption.

The majority generally declares that preemption cases are divided into two types—"substantive" and "jurisdictional"—citing Tribe, American Constitutional Law (2d ed. 1988) section 6-25, page 481, in support of its

---

[1] While analytically useful, these divisions are not rigidly distinct. "Indeed, field pre-emption may be understood as a species of conflict pre-emption: a state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation." (*English* v. *General Electric Company, supra,* 495 U.S. at p. __, fn. 5 [110 L.Ed.2d at p. 75].)

classification. Tribe, however, unlike the majority, uses the terms to correspond to the categories of "conflict" and "field" preemption.[2]

The majority fails to make clear the precise meaning of these terms. A distinction has been made, in the context of *federal labor law*, between preemption based on federal protection of the conduct in question and that based on the need to protect the primary jurisdiction of the National Labor Relations Board (NLRB or Board). (See *Brown v. Hotel Employees* (1984) 468 U.S. 491 [82 L.Ed.2d 373, 104 S.Ct. 3179].) Although the majority does not acknowledge this specialized usage of the terms, the labels "substantive" and "jurisdictional," respectively, actually refer to these two limited classes of cases.

The difference in terminology could be dismissed as largely semantic were it not for the majority's distortion of the law governing so-called "substantive" preemption.

Specifically, the majority relies on the following statement in *Brown v. Hotel Employees, supra*, 468 U.S. 491: "If the state law regulates conduct that is actually protected by federal law, . . . pre-emption follows not as a matter of protecting primary jurisdiction, but as a matter of substantive right. Where . . . the issue is one of an asserted substantive conflict with a federal enactment, then '[t]he relative importance to the State of its own law is not material . . .'" and the federal law controls. (*Id.* at p. 503 [82 L.Ed.2d at p. 384]; see *Free v. Bland* (1962) 369 U.S. 663 [8 L.Ed.2d 180, 82 S.Ct. 1089].)

The majority concludes from this that, although a balancing of state and federal interests may be appropriate to "jurisdictional" preemption, it is

---

[2] Tribe states: "Since congressional purposes can be either substantive or jurisdictional, a state action may be struck down as an invalid interference with the federal design either because it is in *actual conflict* with the substantive operation of a federal program, or because, whatever its substantive impact, it *intrudes upon a field* that Congress has validly reserved to the federal sphere." (Tribe, American Constitutional Law, *supra*, § 6-25, at p. 481, italics added.)

The majority adds the words "[of regulation]" at the end of the quoted statement to support its use of the "substantive" and "jurisdictional" terms, but the addition is misleading. (Maj. opn., *ante*, at p. 1023.) The footnote immediately accompanying the passage makes plain that Tribe refers to traditional preemption principles: "The Supreme Court typically divides preemption analysis into the three categories of 'express preemption,' where Congress has in express terms declared its intention to preclude state regulation in a given area; 'implied preemption,' where Congress, through the structure or objectives of federal law, has impliedly precluded state regulation in the area; and 'conflict preemption,' where Congress did not necessarily intend preemption of state regulation in a given area, but where the particular state law conflicts directly with federal law, or stands as an obstacle to the accomplishment of federal objectives . . . ." (Tribe, American Constitutional Law, *supra*, § 6-25, at p. 481, fn. 14.)

precluded with respect to "substantive" preemption. (Maj. opn., *ante*, at p. 1023.) Thus, the majority simply asserts, without analysis, that plaintiff's state law claims conflict "substantively" with the LMRDA, and must therefore be preempted by the federal statute. In essence, the "substantive" preemption label is used as a substitute for a proper determination of whether the purposes and effects of the federal and state laws at issue "actually conflict."[3]

The majority's reliance on *Brown* v. *Hotel Employees, supra*, 468 U.S. 491, for this facile "trumping" effect of so-called "substantive" preemption is misplaced. A careful reading of *Brown* shows that, if anything, preemption is more readily found in cases that the majority denominates "jurisdictional" rather than "substantive." When there is a need to protect the primary jurisdiction of the NLRB, state laws may be preempted even if they deal with matters only "arguably within" the jurisdiction of the NLRB (see *San Diego Unions* v. *Garmon* (1959) 359 U.S. 236, 244-245 [3 L.Ed.2d 775, 782-783, 79 S.Ct. 773]). In contrast to the usual preemption principles, preemption in such cases may be presumed. As explained in *Brown*: "This presumption of federal preemption, based on the primary jurisdiction rationale, properly admits to exception when unusually 'deeply rooted' local interests are at stake." (*Brown* v. *Hotel Employees, supra*, 468 U.S. at p. 502 [82 L.Ed.2d at p. 384].)

However, "substantive" preemption, as that term is used by the majority, is still subject to the ordinary rules of conflict preemption. So-called "substantive" preemption is really a species of "conflict" preemption.[4] A state

---

[3] Although the majority purports to determine whether there is an "actual conflict" between plaintiff's state law causes of action and the LMRDA, it does not engage in a proper conflict preemption analysis, expressly rejecting the principle that preemption requires an assessment of whether or not the state cause of action relates to the purposes of the federal act.

[4] So is "jurisdictional" preemption. "Jurisdictional" preemption precludes the states from asserting their jurisdiction over matters clearly governed by the National Labor Relations Act (NLRA). In addition, in order to protect the right of the NLRB to determine in the first instance what conduct is or is not within the scope of the NLRA, the states are precluded from asserting jurisdiction over conduct which is even "arguably subject" to the NLRA. But, "jurisdictional" preemption in the federal labor law context is not the same as "field" preemption. The federal government has not "occupied the field" of labor relations to the exclusion of all state regulation. Despite enactment of, e.g., the NLRA and the Taft-Hartley Act, Congress has "le[ft] much to the states." (See *Garner* v. *Teamsters Union* (1953) 346 U.S. 485, 488 [98 L.Ed. 228, 238, 74 S.Ct. 161].)

"When an activity is arguably subject to § 7 or § 8 of the [National Labor Relations] Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." (*San Diego Unions* v. *Garmon, supra*, 359 U.S. 236, 245 [3 L.Ed.2d at p. 783].) If the state courts were permitted to assert jurisdiction over cases "arguably within" the jurisdiction of the NLRB, the potential for conflicting interpretations would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (*Hines*

law is "substantively" preempted when it purports to regulate particular conduct which is directly protected by federal law—an obvious case of "actual conflict." However, whether a state law "actually conflicts" with a federal law is essentially a question of statutory construction. The intent of Congress is the "ultimate touchstone" of preemption analysis. (See e.g., *Wisconsin Dept. of Industry* v. *Gould Inc.* (1986) 475 U.S. 282, 290 [89 L.Ed.2d 223, 230-231, 106 S.Ct. 1057]; *Retail Clerks* v. *Schermerhorn* (1963) 375 U.S. 96, 103 [11 L.Ed.2d 179, 184, 84 S.Ct. 219].)

Therefore, when federal and state laws allegedly conflict, consideration of the respective federal and state interests cannot be ignored. Rather, the purpose and effect of both laws must be assessed to determine whether they "actually conflict"; i.e., whether the state law purports to regulate the same conduct that the federal law "actually protects." (*Brown* v. *Hotel Employees, supra*, 468 U.S. at p. 503 [82 L.Ed.2d at p. 384]; see also *Linn* v. *Plant Guard Workers* (1966) 383 U.S. 53, 59-60 [15 L.Ed.2d 582, 587-589, 86 S.Ct. 657]; *Free* v. *Bland, supra*, 369 U.S. 663, 666-670 [8 L.Ed.2d at pp. 183-186].)

Moreover, although state law may be preempted under a conflict analysis if it frustrates the specific objectives underlying a federal enactment, a "general tension" with the broad or abstract goals of federal laws or programs will not result in preemption. (See *Commonwealth Edison Co.* v. *Montana* (1981) 453 U.S. 609, 633-634 [69 L.Ed.2d 884, 904-905, 101 S.Ct. 2946].) In addition, "[p]reemption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.'" (*Chicago & N. W. Tr. Co.* v. *Kalo Brick & Tile Co.* (1981) 450 U.S. 311, 317 [67 L.Ed.2d 258, 265, 101 S.Ct. 1124].) Thus, preemption of state law is not lightly to be presumed (*Malone* v. *White Motor Corp.* (1978) 435 U.S. 497, 504 [55 L.Ed.2d 443,

---

v. *Davidowitz, supra*, 312 U.S. 52, 67 [85 L.Ed. at p. 587]) to have a uniform body of national labor relations law. The protection of the primary jurisdiction of the NLRB is therefore also an aspect of "conflict" preemption.

Consequently, the distinction the majority attempts to draw between "substantive" and "jurisdictional" preemption does not bear scrutiny.

*San Diego Unions* v. *Garmon, supra*, 359 U.S. 236, is the leading case describing preemption based on the need to protect the primary jurisdiction of the NLRB. There, the problem was whether certain labor conduct (peaceful picketing) was subject to sections 7 and 8 of the NLRA. Section 7 of the NLRA affirmatively protects the rights of workers to organize for collective bargaining, and section 8 prohibits unfair labor practices. Where conduct is clearly protected by section 7 or prohibited by section 8, state jurisdiction must yield to the special jurisdiction conferred on the NLRB to administer a coherent national labor policy. So stated, it is difficult to distinguish this aspect of "jurisdictional" preemption from "substantive," "actual conflict" preemption.

450-451, 98 S.Ct. 1185]), and the state law should not be displaced unless there is a significant conflict between the operation of the local law and concretely identifiable federal interests. (*Boyle* v. *United Technologies Corp.* (1988) 487 U.S. 500 [101 L.Ed.2d 442, 108 S.Ct. 2510].)

With these principles in mind, I turn to an examination of the specific objectives of the LMRDA and their relation to the state claims asserted by plaintiff.

## II. *The LMRDA*

### A. *Background and Purposes*

The LMRDA (29 U.S.C. § 401 et seq.; all further statutory references are to this source unless otherwise noted) was enacted in 1959 as "the product of congressional concern with widespread abuses of power by union leadership." (*Finnegan* v. *Leu* (1982) 456 U.S. 431, 435 [72 L.Ed.2d 239, 243, 102 S.Ct. 1867].) Section 401 sets forth Congress's findings and purpose: "[I]t is essential," that section states, "that labor organizations, employers, and their officials *adhere to the highest standards of responsibility and ethical conduct* in administering the affairs of their organizations, particularly as they affect labor-management relations." (§ 401(a), italics added.)

Congressional investigation during the 1950's had disclosed numerous instances of union corruption and breaches of trust, as well as general disregard for the rights of individual members. Accordingly, the LMRDA was enacted to "afford necessary protection *of the rights and interests of employees and the public generally* as they relate to the activities of labor organizations, employers, labor relations consultants, and their officers and representatives." (§ 401(b), italics added.)

In addition, Congress declared "that enactment of this Chapter is necessary to eliminate or prevent *improper practices* on the part of labor organizations, employers, labor relations consultants, and their officers and representatives . . . ." (§ 401(c), italics added.)

The LMRDA as initially drafted was concerned with disclosure requirements, union trusteeships, and elections for union office.[5] The perceived

---

[5] Sections 431-441 (subchapter III) require certain reports to be prepared and distributed by labor unions, by their officers and employees, and by employers. Sections 461-466 (subchapter IV) deal with the procedures for establishing a trusteeship over a union, and the administration of a union in trusteeship. Sections 481-483 (subchapter V) govern the frequency and manner of elections for union office. Sections 501-504 (subchapter VI) "prescribe[] a code of fiduciary responsibility on the part of union officers, disqualif[y] certain persons from

need to provide additional protections for union members led to the inclusion of several amendments. As a result, subchapter II (§§ 411-415), the "Bill of Rights" for union members, was added.[6] "The amendments placed emphasis on the rights of union members to freedom of expression without fear of sanctions by the union, which in many instances could mean loss of union membership and in turn loss of livelihood. Such protection was necessary to further the Act's primary objective of ensuring that unions would be democratically governed and responsive to the will of their memberships. [Citations.]" (*Finnegan* v. *Leu, supra*, 456 U.S. 431, 435-436 [72 L.Ed.2d at p. 244].)

Thus, the LMRDA was enacted against a backdrop of abuses by union leadership. It was a remedial measure designed to "bid farewell to the regime of benevolent well-meaning union autocrats" (*Blanchard* v. *Johnson* (N.D. Ohio 1975) 388 F.Supp. 208, 215), and instead to protect specific rights of union members, to require implementation of democratic election procedures, and to impose obligations of ethical and fiduciary accountability on union leaders.

### B. *Limited Preemptive Effect*

Consistent with the underlying goals of the LMRDA, the history and text of the Act also disclose a very limited preemptive intent. The Act was designed to supplement, not to supplant, available state law remedies.

### 1. *Savings Clauses*

First, "the Act itself explicitly saves both state criminal actions and state-imposed responsibilities of union officers from preemption by the Act." (*Bloom* v. *General Truck Drivers* (9th Cir. 1986) 783 F.2d 1356, 1361, fns.

---

holding office in a union . . . , prohibit[] unions from paying fines incurred by its officers or employees, and greatly restrict[] loans that a union can make." (*Tomko* v. *Hilbert* (3d Cir. 1961) 288 F.2d 625, 627.)

[6] Section 411(a) provides that all union members shall have (1) equal rights to nominate candidates, vote, attend union meetings, and to participate in union business; (2) the right to meet and assemble freely with other members and to freely express views upon candidates or union business; (3) the right not to have dues increased without a vote of the members; (4) the right to sue the union, provided internal union grievance procedures are first exhausted and (5) the right not to be disciplined by the union (except for nonpayment of dues) without a written notice of charges and a full and fair hearing. Section 412 provides for a civil action for violation of the "Bill of Rights" subchapter, with jurisdiction vested in the federal district court. Section 413 states that union members' other rights and remedies under state or federal law are not limited by the provisions of subchapter II. Section 414 provides for a right to copies of any collective bargaining agreement, and section 415 instructs unions to inform the members of the members' rights under the LMRDA.

omitted; 29 U.S.C. §§ 524, 523(a).)[7] In addition, section 413, immediately following the provision in section 412 for a civil action for a violation of subchapter II rights, states: "Nothing contained in this subchapter [subchapter II] shall limit the rights and remedies of any member of a labor organization under any State or Federal law or before any court or other tribunal, or under the constitution and bylaws of any labor organization."

Thus, in the context of union-member relations, the goal of the LMRDA is to preserve to the union members, not to preempt, existing federal and state remedies. As explained in *Posner v. Utility Workers Union of America* (1975) 47 Cal.App.3d 970 [121 Cal.Rptr. 423]: "Congress has expressly withheld preemption of any rights or remedies which a union member may have under state law. [Citations.] The rights and remedies provided by the federal statute are additional to other rights of union members under state law." (*Id.* at p. 973; see also *Tomko v. Hilbert, supra,* 288 F.2d 625, 629 ["Rights and remedies [the union member] may have under state law have not been preempted or affected by passage of the bill-of-rights section of the LMRDA."].)

## 2. *Limited Scope of LMRDA*

The scope of the LMRDA is further limited. It does not address the relationship between union officials and union employees in their status *as employees*, but only as members. Putting the matter more directly in terms of "actual conflict" preemption, it is difficult to conclude that Congress intended to preempt state regulation of conduct (employer-employee relations) which the federal act *does not even purport to regulate*.

Moreover, "[t]he continued vitality of the California statutes in light of [the LMRDA's] saving[s] clauses logically implies the continued vitality of the state's means of enforcing those statutes . . . . Thus, although the savings clauses addressing union members do not directly save [a union business agent's] state cause of action . . . the clauses addressing criminal

---

[7] Section 524 states: "Nothing in this chapter shall be construed to impair or diminish the authority of any State to enact and enforce general criminal laws with respect to robbery, bribery, extortion, embezzlement, grand larceny, burglary, arson, violation of narcotics laws, murder, rape, assault with intent to kill, or assault which inflicts grievous bodily injury, or conspiracy to commit any of such crimes."

Section 523(a) provides: "Except as explicitly provided to the contrary, nothing in this chapter shall reduce or limit the responsibilities of any labor organization or any officer, agent, shop steward, or other representative of a labor organization, or of any trust in which a labor organization is interested, under any other Federal law or under the laws of any State, and, except as explicitly provided to the contrary, nothing in this chapter shall take away any right or bar any remedy to which members of a labor organization are entitled under such other Federal law or law of any State."

actions and union officers' duties imply that [the business agent] can maintain his action." (*Bloom* v. *General Truck Drivers, supra,* 783 F.2d 1356, 1361.)

In *Tomko* v. *Hilbert, supra,* for example, a union member attempted to invoke the federal jurisdiction provided in section 412 in a suit against two other union members, who had allegedly libeled and assaulted him. The court held that the LMRDA "is narrowly focused on protecting the union-member relationship" (288 F.2d at p. 627), and that the plaintiff's rights as a member were protected from interference *by a union official.* Because the plaintiff did not allege that the defendants were union officials, or that any union official had interfered with his rights, his cause of action was not governed by the LMRDA. However, although the LMRDA did not provide a federal action, neither did it preclude a state action for ordinary tort claims "merely because the conduct occurs in a union hall during a union meeting . . . ." (*Id.* at p. 629.) The court held that "[t]*he state courts remain open to appellant.* Rights and remedies that he may have under state law have not been preempted or affected by passage of the bill-of-rights section of the LMRDA." (*Ibid.,* italics added.)

In *Strauss* v. *International Brother. of Teamsters, etc.* (E.D.Pa. 1959) 179 F.Supp. 297, a discharged union business agent attempted to bring suit under the LMRDA in federal court, arguing he was improperly discharged because the union had misconstrued a provision of the Act. The court held that, although section 412 authorizes civil suit in the federal district court for violation of subchapter II rights, "it must appear that the right, title or interest which he alleges has been violated by the defendant is created by or finds protection under one of these sections . . . . [¶] The right which plaintiff now seeks to protect *as against the defendant* is the right to be free from discharge as business agent of a labor union . . . . As between the parties to this suit, this is at best a contractual right or a right of 'status.' " (179 F.Supp at pp. 299-230, original italics.) Because the LMRDA deals with the union-member relationship, and does not involve jurisdiction over a contractual dispute as between employer and employee, "[t]his [contractual] right is enforceable, if at all, *in the common law courts of the state in which the contract arose* . . . ." (*Id.* at p. 301, italics added.)

*Finnegan* v. *Leu, supra,* 456 U.S. 431, on which the majority relies, is not to the contrary. In *Finnegan,* an appointed union business agent attempted to sue in federal court for alleged violation of his rights under the LMRDA. The plaintiff had vigorously supported an opposing candidate in a contested election for the union presidency. The new president discharged plaintiff and other business agents who had opposed him. The United States Supreme Court held that the "Bill of Rights" under the LMRDA, including

the right of free speech, applied to protect union members *qua members*, and was not intended to protect plaintiff in his capacity as a union *employee*. *Finnegan* does not, as the majority implies, "sanction" or guarantee the power of union officials to discharge union employees for opposing their election;[8] rather, the Supreme Court held only that the LMRDA did not provide a federal remedy. *Finnegan* does not suggest that the plaintiff was precluded from bringing a *state* claim on a matter admittedly outside the scope of the LMRDA.

### 3. *"Union Democracy"*

At the heart of the majority opinion is its conclusion that the preservation of union democracy requires that union leadership have a free hand in discharging employees for reasons of policy. Even assuming that the LMRDA sanctions "patronage firing" as an adjunct of its purpose to promote "union democracy" (see *Finnegan v. Leu, supra*, 456 U.S. 431, 441 [72 L.Ed.2d at p. 247]; *Tyra v. Kearney* (1984) 153 Cal.App.3d 921, 926 [200 Cal.Rptr. 716]), that purpose does not provide union leadership with an unfettered license to dismiss union employees.

In *Sheet Metal Workers v. Lynn* (1989) 488 U.S. 347 [102 L.Ed.2d 700, 109 S.Ct. 639], for example, a local union in financial crisis was placed under trusteeship by the president of the international union. The plaintiff, an elected business agent, was an outspoken member of a faction in the

---

[8] Nothing in subchapter I, the preamble, or in the provisions of subchapter II, the "Bill of Rights," directly approves the practice of union patronage in hiring and firing of union business agents. The only other conceivable source of such direct protection would lie in subchapter V (§§ 481-483), which governs the procedures for election of union officers. A review of its provisions also fails to show any direct sanction for union patronage.

Section 481 provides for, among other things, the frequency of national, international and local elections; distribution of campaign literature by the union to the members on a nondiscriminatory basis; election of officers of intermediate bodies (e.g., general committee, joint boards); nomination of candidates; voting rights, including "the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof'; election of officers by convention of delegates; prohibition against using union dues on behalf of any candidate; and removal of officers guilty of serious misconduct.

Section 482 permits a member to file a complaint with the Secretary of Labor challenging an election; requires the secretary to investigate and authorizes the filing of a civil action in the district court; authorizes the trial court, upon a proper showing, to declare an election void and to order a new election; and provides for appellate rights.

Section 483 states that, except as otherwise provided, the election may be conducted according to the union's bylaws and constitution; and that, before an election, other rights and remedies are available to enforce the constitution and bylaws, but that, once the election has been held, the procedure provided in section 482 is the exclusive remedy for challenging an election.

The LMRDA does not address and does not provide in any manner for the patronage rights of elected union officers.

union which opposed a dues increase as a method of solving the local's financial problems. The trustee discharged the plaintiff from his position as a business agent because of his (successful) opposition to the dues increase.

The plaintiff brought suit in federal court under section 412 alleging violation of his free speech rights under section 411(a)(2) of subchapter II. The union alleged that the dismissal was immune from attack under *Finnegan* v. *Leu, supra,* 456 U.S. 431, because it was "policy" based. The Supreme Court disagreed, observing that the discharge penalized plaintiff for the exercise of his free speech rights, and deprived the union membership of an elected business agent. "His removal, therefore, hardly was 'an integral part of ensuring a union administration's responsiveness to the mandate of the union election.' [Citations.]" (*Sheet Metal Workers* v. *Lynn, supra,* 488 U.S. at p. 355 [102 L.Ed.2d at p. 710].) In addition, in light of the plaintiff's removal, "other members of the Local may well have concluded that one challenged the union's hierarchy, if at all, at one's peril. This is precisely what the Congress sought to prevent when it passed the LMRDA." (*Ibid.*)

The court carefully examined the purposes of the LMRDA, and determined that this discharge did not promote the purpose of "union democracy." Accordingly, the court found not only that the plaintiff's discharge was not "sanctioned" by the LMRDA, but also that the Act provided affirmative redress for the breach of the plaintiff's free speech rights.

Justice White's concurring opinion in *Sheet Metal Workers* v. *Lynn* underscores the distinction between a union official's exercise of union patronage, and his or her power to hire and fire as an ordinary employer: "In this case, unlike *Finnegan*, respondent was not discharged by an incoming elected president with power to appoint his own staff, but by a trustee whose power to dismiss and appoint officers, for all that is shown here, went no farther than the Local's president to discharge for cause, *i.e.*, for incompetence or other behavior disqualifying them for the tasks they were expected to perform as officers. Respondent's speech opposing the dues increase was the speech of a member about a matter the members were to resolve, and there is no countervailing interest rooted in union democracy that suffices to override that protection." (488 U.S. at p. 360 [102 L.Ed.2d at p. 713] (conc. opn. of White, J.).)

In *Bloom* v. *General Truck Drivers, supra,* 783 F.2d 1356, a union member alleged he was wrongfully discharged as coordinator of the business agents and business manager of the union because he refused to illegally alter the minutes of a union meeting. The Court of Appeals held the plaintiff could not properly state a federal claim under section 412 of the LMRDA because the discharge affected him as an employee and not as a

union member (citing *Finnegan* v. *Leu, supra*, 456 U.S. 431, and *Cehaich* v. *International Union, U.A.W.* (6th Cir. 1983) 710 F.2d 234, 238). The court further held, however, that the plaintiff's state claim was *not preempted*: "The kind of discharge alleged, retaliation for refusal to commit a crime and breach a trust, is not the kind sanctioned by the Act, or by the courts in *Finnegan* and *Tyra*. Protecting such a discharge by preempting a state cause of action based on it does nothing to serve union democracy or the rights of union members; it serves only to encourage and conceal such criminal acts and coercion by union leaders." (783 F.2d at p. 1362.)

The *Bloom* court properly analyzed the state claim in terms of its relation to the purposes of the LMRDA. Not only would the state action not inhibit "union democracy," it concluded, but preemption would deprive the plaintiff of *any* viable remedy, and thus frustrate the very purposes of the Act. (*Bloom* v. *General Truck Drivers, supra*, 783 F.2d 1356.)

*Brown* v. *Hotel Employees, supra*, 468 U.S. 491, is also instructive. New Jersey casino laws regulated unions representing casino employees and disqualified from union office those persons who had ties to organized crime. The union argued that section 7 of the NLRA (codified at 29 U.S.C. § 157)—including the right of employees to bargain collectively through representatives of their own choosing—preempted the jurisdiction of the state casino commission to disqualify any member from holding office.

The Supreme Court held that section 7 of the NLRA (29 U.S.C. § 157) did *not* confer an absolute right on employees to choose the officials of their bargaining representatives, notwithstanding the impact on "union democracy." Ironically, it was the enactment of the LMRDA itself which led the court to this conclusion.[9] "Title V [subchapter VI] of LMRDA imposes various restrictions on labor union officials and defines certain qualifications for them . . . . [¶] By enacting § 504(a) [setting forth disqualifications from office for conviction of crime], Congress has unmistakably indicated that the right of employees to select the officers of their bargaining representatives is not absolute and necessarily admits of some exception." (*Brown* v. *Hotel Employees, supra*, 468 U.S. 491, 505 [82 L.Ed.2d at pp. 385-386].)

In addition, the high court noted, "another provision of LMRDA, [section 523(a)], is 'an express disclaimer of pre-emption of state laws regulating the responsibilities of union officials . . . .' *De Veau* v. *Braisted*, 363 U.S.

---

[9] Significantly, the unions had also argued in the federal district court that the New Jersey regulations, precluding elected officials from holding office if disqualified under state criteria, were preempted by the LMRDA. The district court held the LMRDA did not preempt the sanctions provided by New Jersey law. The unions did not appeal that ruling. (*Brown* v. *Hotel Employees, supra*, 468 U.S. 491, 500, fn. 8 [82 L.Ed.2d at p. 382].)

144, 157 (1960) . . . . In affirmatively preserving the operation of state laws, [section 523(a)] indicates that Congress necessarily intended *to preserve some room for state action concerning the responsibilities and qualifications of union officials.*" (*Brown* v. *Hotel Employees, supra*, 468 U.S. at pp. 505-506 [82 L.Ed.2d at p. 386], italics partially added, fns. omitted.)

As the foregoing cases demonstrate, the concept of "union democracy" in the LMRDA was designed to make union leadership accountable to its members, not to put the members at the mercy of its leaders. The Act does not, as the majority suggests, demand a broad rule of state preemption in order to effectuate the federal mandate. Instead, each case must be examined to determine whether the conduct regulated by the state actually conflicts with the conduct intended to be protected by the Act. As explained below, plaintiff's state law claims for wrongful discharge do not impinge upon any federally protected preserve.

## III. *Plaintiff's Wrongful Discharge Claims*

The majority states as a general principle that the federal interest in union democracy "preempts state causes of action for wrongful discharge or related torts . . . ." (Maj. opn., *ante*, at p. 1021.) This assertion does not withstand scrutiny.

The majority's conclusion rests upon an uncritical reading of the statement in *Tyra* v. *Kearney, supra*, 153 Cal.App.3d 921, that an elected union officer "must have the unrestricted freedom 'to choose a staff whose views are compatible with his own.'" (*Id.* at p. 926, quoting *Finnegan* v. *Leu, supra*, 456 U.S. 431, 441 [72 L.Ed.2d at p. 247].)

The *Tyra* court failed to perceive, however, that the Supreme Court in *Finnegan* did not hold that the LMRDA guarantees union officials unrestricted power to discharge union employees. It held only that the LMRDA does not address the issue of union patronage. Patronage may, of course, be consistent with the purposes of the LMRDA to the extent that it permits union leaders to implement the policies they were elected to carry out,[10] but a proper preemption analysis will focus on the actual effect that a recognition of plaintiff's wrongful discharge claims would have on democratic

---

[10] "[T]he Act's overriding objective was to ensure that unions would be democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections. [Citation.] Far from being inconsistent with this purpose, the ability of an elected union president to select his own administrators is an integral part of ensuring a union administration's responsiveness to the mandate of the union election." (*Finnegan* v. *Leu, supra*, 456 U.S. at p. 441 [72 L.Ed.2d at p. 247].)

union governance. In *Tyra* (as in *Finnegan*), the union business agent was discharged precisely because of opposing political views. Permitting a state law action grounded upon such a policy-based discharge could properly be viewed as impinging on the "freedom" of a union leader, under the LMRDA, "to choose a staff *whose views are compatible with his own*," for the purpose of "promot[ing] the policies and programs promised to the electorate." (*Tyra* v. *Kearney, supra*, 153 Cal.App.3d 921, 926.)

However, dismissal of a union employee involving bad faith and related torts, such as defamation and intentional infliction of emotional distress, as plaintiff herein alleges, does nothing to serve the federal interest in democratic union representation. Indeed, such conduct undermines the very purposes of the LMRDA. As the Court of Appeal stated below, "Union officials are not elected to breach contracts or commit torts and, if they do so, the fact that they are 'democratically elected' is beside the point. This case has nothing to do with [union] democracy . . . . This is a garden-variety 'wrongful termination' case which just happens to be brought against a union . . . ."

The majority dismisses the point with the remarkable assertion that it is "unworkable" to distinguish those claims which implicate the interests of the LMRDA from those which do not. It then states that preemption under the LMRDA must *not* be based upon an analysis of whether the state law claims against a union relate to the purposes of the Act. These statements defy logic and betray a fundamental misunderstanding of preemption and wrongful discharge principles.

As we have seen, when preemption is based upon an "actual conflict" of state and federal law, the precise question before the court is whether the state law conflicts with either the express or necessarily implied purposes of the federal program. (See *Brown* v. *Hotel Employees, supra*, 468 U.S. 491; *Linn* v. *Plant Guard Workers, supra*, 383 U.S. 53, 61, 64 [15 L.Ed.2d at pp. 589, 590-591].) The very task we are called upon to perform is to discern the specific federal interests Congress intended to protect by its enactment and to determine whether the state law at issue "relates to" those purposes so as to significantly interfere with their achievement. The United States Supreme Court has not, to my knowledge, crafted a new category of preemption based on the "workability" of differentiating federal and state interests.

Moreover, the specter of "unworkability" raised by the majority dissolves into its ephemeral essence when scrutinized in the light of reason. The majority fears that preemption will be "subverted" by artful pleading of a

"garden variety" claim of, e.g., discharge for inefficiency or dishonesty rather than for the political needs of the union leadership. However, the complaint must do more than merely allege that the plaintiff was terminated for "inefficiency" or "dishonesty." Otherwise, the complaint on its face will establish *good cause* for the termination. In addition, in order to avoid summary judgment, the plaintiff will be required to support the allegations of the complaint with specific evidentiary facts sufficient to raise a triable issue that the discharge not only was not policy based, but was also for improper reasons.

Plaintiff's claims here are based on more than mere termination alone. She alleges in addition that the manner of the firing was contrary to the union's established personnel procedures, abusive, and defamatory. Plaintiff alleges that defendant and petitioner Brown instigated the termination by intentionally defaming her with charges of dishonesty when Brown knew that the accusations were false. Brown initially attempted to terminate plaintiff without any notice or opportunity to hear or respond to charges against her, contrary to provisions of the union's personnel manual, while plaintiff was out of the country on leave. When plaintiff was ultimately summoned to the union board meeting—ostensibly to respond to the charges—she discovered that the board had already interviewed candidates to replace her. Brown's announcement, before the meeting began, that she would appoint a new business agent also indicated the sham nature of the proceeding.

Plaintiff's allegations implicate no legitimate union policy or exercise of union democracy. As Justice Eagleson suggests (see dis. opn. of Eagleson, J., *ante*, at p. 1037), there is nothing in the general notion of "union democracy" which prevents a union, as part of a democratically determined policy, from establishing certain rules of personnel practice. And, surely, nothing in the LMRDA is meant to sanction defamation, bad faith, or intentional infliction of emotional distress.

The point is, unless a termination somehow contravenes the purposes of the LMRDA, the union's actions will be subject to the same regulations as ordinary employers. The courts have uniformly engaged in a straightforward analysis of the competing interests to determine the question. (See, e.g., *Sheet Metal Workers* v. *Lynn, supra*, 488 U.S. 347.)

Where the discharge is premised on union policy, as in *Tyra* v. *Kearney, supra*, 153 Cal.App.3d 921, the matter will be deemed preempted. Where the plaintiff is terminated for refusal to violate a state law, as in *Bloom* v.

*General Truck Drivers, supra,* 783 F.2d 1356 (i.e., a *Tameny* claim; *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314]), or for other improper reasons, the discharge is peripheral to any legitimate interests served by the Act and preemption will not apply.

This approach is typified by the high court's decision in *Farmer* v. *Carpenters* (1977) 430 U.S. 290 [51 L.Ed.2d 338, 97 S.Ct. 1056]. There, the question was whether a state court action against a union for intentional infliction of emotional distress was preempted under the NLRA. The plaintiff was a union member and officer who disagreed with other union officials over policy matters. The union began to discriminate against the plaintiff in hiring hall referrals to employers. When the plaintiff complained about the discrimination, he was subjected to an abusive campaign of harassment, threats and intimidation. The Supreme Court found there was no federal protection under the NLRA for such "outrageous conduct" by union officials. "Thus . . . permitting the exercise of *state* jurisdiction over such complaints does not result in state regulation of federally protected conduct." (*Id.* at p. 302 [51 L.Ed.2d at p. 351].)

The *Farmer* court carefully distinguished those causes of action which implicated the concerns of the NLRA from those which did not. The plaintiff's separate claims for hiring hall discrimination, for example, if supported by evidence before the NLRB, would have established an unfair labor practice, subject to the jurisdiction of the NLRB. The allegations of emotional distress and attendant physical injury, however, would have no bearing in any hearing before the NLRB. "[T]he state-court tort action can be adjudicated without resolution of the 'merits' of the underlying labor dispute. Recovery for the tort of emotional distress under California law requires proof that the defendant intentionally engaged in outrageous conduct causing the plaintiff to sustain mental distress. [Citations.] The state court need not consider, much less resolve, whether a union discriminated or threatened to discriminate against an employee in terms of employment opportunities. *To the contrary, the tort action can be resolved without reference to any accommodation of the special interests of unions and members in the hiring hall context.*" (*Farmer* v. *Carpenters, supra,* 430 U.S. at pp. 304-305 [51 L.Ed.2d at p. 353], italics added.)

In a similar vein, the United States Supreme Court in *Linn* v. *Plant Guard Workers, supra,* 383 U.S. 53, held that a claim for defamation is not preempted under the NLRA. The court emphasized that "malicious libel enjoys no constitutional protection in any context" and that it was not protected under the NLRA. (*Id.* at pp. 63, 61 [15 L.Ed.2d at pp. 590, 589].)

A libel in and of itself does not constitute an unfair labor practice within the jurisdiction of the NLRB and, in any event, "[t]he injury that the statement might cause to an individual's reputation . . . has no relevance to the Board's function." (*Id*. at p. 63 [15 L.Ed.2d at p. 590].) Thus, the high court concluded that permitting a state cause of action for defamation would not interfere with any national labor policy.

Here, similarly, plaintiff's state law causes of action for defamation, wrongful discharge and intentional infliction of emotional distress do not threaten any federal interest in "union democracy" or any other national interest embodied in the LMRDA. Plaintiff is not a member of the union and there is no collective bargaining agreement with the union-employer; thus there is no conceivable unfair labor practice or other concern within the jurisdiction of the NLRB with which the action might interfere. Plaintiff's state law tort actions can be resolved without reference to any matters governed by the LMRDA (e.g., reporting and disclosure requirements, trusteeship procedures, conduct of union elections, fiduciary responsibilities, and other anticorruption measures). The LMRDA does not purport to regulate relationships between a union and its nonmember employees, and therefore plaintiff's suit does not interfere with any conduct the LMRDA is designed to "actually protect."

The fundamental question in all cases of wrongful discharge is, "What is the reason for the discharge?" We do not presume in such cases that the finder of fact is incapable of answering that question. We should not presume so here. If the discharge is for a federally protected policy-based reason, then the matter may be disposed of on demurrer or summary judgment. If, as here, it is undisputed that the reason for the discharge was *not* based on union policies or any other interest related to "union democracy," there is no basis for a finding of federal preemption.

CONCLUSION

It is undisputed that plaintiff's firing did not implicate union policies or democratic governance. In enacting the LMRDA, Congress did not intend to immunize the kind of misconduct alleged here. Indeed, the text of the LMRDA and the decisions construing it demonstrate that the preemptive force of the Act was intended to be quite limited; state law rights and remedies such as those asserted by plaintiff were to be preserved, not preempted, in accordance with the overarching spirit and purpose of the Act—to ensure that union officials "adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their orga-

nizations . . . ." (§ 401(a).) Ironically, in seeking to preserve the federal interest, the majority subverts it by sanctioning arbitrary discharge.

In earlier times it was said that, "Heaven will protect the working girl." With today's decision, union employees may find that heavenly intervention is indeed their last best hope of protection.

For all of the foregoing reasons, I would affirm the judgment of the Court of Appeal.