[No. B153293. Second Dist., Div. Seven. June 30, 2003.]

DONALD C. SMITH, Plaintiff and Appellant, v.
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
LOCAL UNION 11, et al., Defendants and Respondents.

1638

**COUNSEL**

Helena S. Wise for Plaintiff and Appellant.

Geffner & Bush, Hope J. Singer, Robert Kropp, Jr., and Renee E. Jacobs for Defendants and Respondents.

## OPINION

**JOHNSON, Acting P. J.**—Plaintiff Donald C. Smith was terminated from his job as an organizer with defendant Local 11 of the International Brotherhood of Electrical Workers (union). He sued the union and its business manager, Marvin Kropke, for breach of contract, wrongful termination in violation of public policy, age and disability discrimination, and intentional and negligent infliction of emotional distress. In addition to the usual employer defenses, defendants contended all of Smith's claims were barred by the federal Labor-Management Reporting and Disclosure Act (LMRDA).[1] The trial court awarded judgment to defendants after sustaining their demurrer to Smith's emotional distress claims and granting their motions for judgment on the pleadings and summary judgment as to the remaining causes of action.

We hold the LMRDA does not preempt claims by a union employee against the union for wrongful discharge based on violation of the public policy against age and disability discrimination.

### FACTS AND PROCEEDINGS BELOW

The following facts are essentially undisputed. Where there are disputes we give Smith's version of the event if it is supported by evidence in the record.[2]

In an election for union business manager, Smith agreed to support Kropke's candidacy in return for Kropke's promise to give Smith "any position [he] wanted, for as long as [Kropke] was in office." When Kropke won the election, Smith chose the job of compliance officer responsible for monitoring the payment of prevailing wage rates on public works projects. This was essentially a "9-to-5" job, 40 hours a week.

Smith worked for the union as a compliance officer for nearly a year. During that time Kropke commended Smith on his work. Kropke never

---

[1] Title 42 United States Code section 401 et seq.

[2] *Artiglio v. General Electric Co.* (1998) 61 Cal.App.4th 830, 835 [71 Cal.Rptr.2d 817] (doubts as to whether material, triable issues of fact exist are resolved in favor of party opposing summary judgment).

complained to Smith about his job performance, never disciplined him, and never told him his position was in jeopardy.

In July 1998, Smith suffered severe injuries when a runaway truck smashed into the motor home in which he and his family were riding. The motor home exploded in flames and Smith, who could not release his seat belt, was trapped inside. While he struggled to free himself, Smith inhaled hot, toxic fumes which burned his throat, larynx and trachea and seriously damaged his lungs. Passing motorists managed to pull Smith to safety. Smith's wife and son were also injured in the accident.

Following the accident Smith suffered from uncontrollable bouts of coughing, blurred vision and back pain. He had several telephone conversations with Kropke in July and August 1998 in which he detailed his medical condition. Smith testified in one conversation on or about August 8, he told Kropke: "I was still in shock, I could not think clearly, I could not breathe and take in air properly, my back was in terrible pain, I could not sleep at night, my stamina was not the same, and I was worried sick about my family financially and medically as well." Kropke did not insist Smith return to work nor did he inform Smith his job as a compliance officer was in jeopardy if he did not return soon. The union was no longer paying Smith his salary and his only income was from state disability insurance.

For financial reasons, and against his doctors' advice, Smith decided to return to work in early September 1998. Before resuming his duties as a compliance officer, Smith had a meeting with Kropke. In his testimony, Smith described the meeting as follows: "On September 4th I met with Marvin Kropke. At that time Marvin told me that I could not have my old job back. Marvin told me that if I wanted to try organizing, that was all he had for me. I told Marvin that I didn't think I could physically cut it as an organizer, that the workload, long hours and job stress were too taxing, but that notwithstanding the same, I desperately needed my job and would do my best. Marvin told me that he realized it would be difficult but there were no other options."

Smith undertook his new position as a union organizer the following week. Initially, Smith's work was relatively sedentary. It involved making telephone calls from the union office, conducting record searches on the Internet, and visiting public agencies to check building and inspection permits. Later in the month, however, Smith was told he had to join the other organizers in the field doing picket duty. Kropke also announced he was increasing the organizers' work hours to between 60 and 80 hours per week.

At a staff meeting on September 25, Smith told Kropke it was "impossible" for him to work 60 to 80 hours a week given his physical and emotional condition. Smith's coughing had gotten worse since being transferred to the organizer job. His doctor attributed this to job stress.

After Smith had been working as an organizer for approximately three weeks, Kropke called him into his office. Kropke told Smith he understood Smith had decided to run against him for the job of business manager at the next election. Kropke demanded Smith publicly repudiate his candidacy and announce his loyalty to Kropke's administration. Smith denied the accusation he planned to run against Kropke in the next election. Kropke then demanded Smith make a contribution to his election "war chest." Smith told Kropke it was unfair for him to make such a demand in view of what he was going through as a result of his recent accident, including two months without pay. Kropke gave Smith until the next day to "tell him [his] intentions."

The next day Kropke again called Smith into his office. Kropke did not bring up the issue of Smith's loyalty or his contribution to Kropke's reelection campaign. Instead he began by telling Smith of the great respect he had for Smith and his family. Then, according to Smith, Kropke stated: "I'm letting you go. It's for your own good. What you need to do is rest and recuperate and look out for your family." Kropke continued: "I know it's hard on you guys asking you to work 60-80 hours per week, but it's much harder nowadays than in the past and it's much easier on young guys." He went on to remark these long hours would be "detrimental to [Smith's] health" and noted, "[Y]ou aren't getting any younger; in fact you are older than I am." Smith was 55 years of age when he was fired.

Smith brought this action against the union and Kropke alleging breach of an oral employment contract, wrongful termination in violation of public policy, age and disability discrimination, and intentional and negligent infliction of emotional distress.

The trial court sustained demurrers to the emotional distress claims on the ground they were barred by the state workers' compensation law. It granted a judgment on the pleadings on the "cause of action" for breach of the contractual covenant of good faith and fair dealing.[3] Finally, the court granted defendants' motion for summary judgment as to the causes of action for breach of contract, wrongful termination in violation of public policy,

---

[3]This ruling was undoubtedly correct and is not challenged on appeal. A breach of the covenant of good faith and fair dealing does not give rise to a cause of action separate from

and age and disability discrimination on the ground they were preempted by the LMRDA. Smith filed a timely appeal from the judgment.

We hold as follows. The LMRDA does not preempt Smith's causes of action for wrongful termination in violation of public policy based on age and disability discrimination and for age and disability discrimination under the California Fair Employment and Housing Act (FEHA). Furthermore, the trial court erred in granting the union's motion for summary judgment on the merits of Smith's cause of action for disability discrimination under FEHA. We also conclude Smith's causes of action for intentional and negligent infliction of emotional distress against the union are not preempted by the Workers' Compensation Act.

We further hold the LMRDA does preempt Smith's cause of action for breach of contract and the union was entitled to summary judgment on the merits of Smith's cause of action for age discrimination under FEHA. Because Kropke was not Smith's "employer," he cannot be held liable under the surviving causes of action for wrongful termination in violation of public policy or disability discrimination under FEHA. Moreover, since the claims of intentional and negligent infliction of emotional distress arise from the discrimination claims, we hold Kropke cannot be held liable for the emotional distress claims either.

## DISCUSSION

I. *The Federal Labor-Management Reporting and Disclosure Act (LMRDA) Does Not Preempt an Action Against a Union by a Union Employee Arising out of Discrimination Based on Age or Disability.*

In *Screen Extras Guild, Inc. v. Superior Court*,[4] a former business agent of the union sued for breach of contract after she was discharged from her position. The defendant union petitioned for a writ of mandate after the trial court overruled its demurrer to the complaint. The union argued the business agent's action was preempted by the LMRDA, whose primary objective, according to the United States Supreme Court, was to ensure union democracy.[5] According to the union, democracy could not be ensured unless its

---

a cause of action for breach of the contract containing the covenant. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 327 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (*Guz*).)

[4]*Screen Extras Guild, Inc. v. Superior Court* (1990) 51 Cal.3d 1017 [275 Cal.Rptr. 395, 800 P.2d 873] (hereafter *Screen Extras*).

[5]*Finnegan v. Leu* (1982) 456 U.S. 431, 435-436 [102 S.Ct. 1867, 1870-1871, 72 L.Ed.2d 239] (hereafter *Finnegan*).

elected officials were free to select their own staffs and discharge those with whom they felt unable to work or were not in accord with their policies.[6]

The California Supreme Court agreed with the union and held these so-called "patronage" discharges were protected by the LMRDA. ■ "The primary objective of the LMRDA," the court stated, "is to ensure that unions are democratically governed and responsive to the will of their member-ships."[7] In order to effectuate this policy, the LMRDA must be construed to preempt state laws governing employment contracts. Enforcement of such laws would intrude on the prerogative of elected union officials to choose staff members with views comparable to their own and in whom they have confidence.[8]

The court limited its holding in *Screen Extras* to union employees who were in administrative or "policymaking" positions.[9] The court reasoned that in enacting the LMRDA, Congress intended "elected union officials shall be free to discharge management or policymaking personnel" as a means " ' "of ensuring a union administration's responsiveness to the mandate of the union election." ' . . ."[10] Because management or "policymaking" personnel were in the best position to advance or thwart elected officials' policies, they were the ones most clearly subject to unfettered hiring and retention decisions. While recognizing its ruling provided union management employees less protection from wrongful discharge than similarly situated employees in other organizations, the court concluded: " 'Congress simply was not con-cerned with perpetuating appointed union employees in office at the expense of an elected president's freedom to choose his own staff.' . . ."[11]

The *Screen Extras* opinion left two questions unanswered. Does the class of claims preempted by the LMRDA include those brought by *non*policy-making employees?[12] Does the preempted class of claims include claims of employment discrimination based on sex, race, age, disability, religion, and the like?[13]

For the reasons explained below, we need not address the first question because the undisputed evidence shows Smith was a member of the union's

---

[6]*Screen Extras, supra,* 51 Cal.3d at page 1025.
[7]*Screen Extras, supra,* 51 Cal.3d at page 1024.
[8]*Screen Extras, supra,* 51 Cal.3d at pages 1032-1033.
[9]*Screen Extras, supra,* 51 Cal.3d at pages 1021, 1029. In reaching this conclusion the court chiefly relied on *Finnegan, supra,* 456 U.S. 431.
[10]*Screen Extras, supra,* 51 Cal.3d at page 1028, citations omitted.
[11]*Screen Extras, supra,* 51 Cal.3d at page 1033, citation omitted.
[12]*Screen Extras, supra,* 51 Cal.3d at page 1032, footnote 11.
[13]See *Screen Extras, supra,* 51 Cal.3d at page 1025, footnote 5.

policymaking staff. As to the second question, the short answer is: not in *this* century; not in *this* court.

### A. *As a Union Organizer, Smith Was a Policymaking Employee.*

In *Screen Extras* the Supreme Court made clear "policymaking" personnel include not only those who actually make union policy but those who carry it out. The latter are denied job protection because they "are in a position to thwart the implementation of policies and programs advanced by elected union officials and thus frustrate the ability of the elected officials to carry out the mandate of their election."[14]

The question whether an employee is a "policymaker" can sometimes be decided as a matter of law[15] and other times must be submitted to the trier of fact.[16] Here, the undisputed evidence submitted in connection with the summary judgment motion establishes Smith's position as an organizer was a policymaking position.

As a general rule, union organizers have significant responsibility for the day-to-day implementation of union affairs. Smith testified his activities as an organizer included "job-site visits, stakeouts, picketing, the usual activities of an organizer." Thus, Smith represented the union and, thereby, its policies before potential members, employers and the public. As one court put it, in carrying out these activities the organizer is "in effect, the union."[17] Moreover, Smith admitted he had been fired from his position as organizer under a prior union administration because he refused to implement the union's policy and plans for organizing nonaffiliated workers.

Smith argues that during his brief stint as an organizer he merely "tagged along" with other organizers because he was not in physical condition to do some of the things organizers normally do. We find this argument unpersuasive. The question whether a position is a "policymaking" position depends on the normal duties and responsibilities of the job, not on what the employee was actually doing immediately before being fired. Furthermore, even if Smith was not capable of performing some of the physical activity associated with the job of organizer, he could speak, read, and use a computer and was thereby in a position to either promote or thwart "the

[14]*Screen Extras, supra*, 51 Cal.3d at page 1029; accord, *Rutledge v. Aluminum, Brick & Clay Workers, Intern.* (11th Cir. 1984) 737 F.2d 965, 967.

[15]*Screen Extras, supra*, 51 Cal.3d at page 1031 (holding business agents and business representatives are policymaking personnel as a matter of law).

[16]*Young v. Internatl. Bhd. of Engineers* (1996) 114 Ohio App.3d 499 [683 N.E.2d 420, 423].

[17]*Witmeyer v. Broth. of Ry. Airline & S.S. Clerks* (4th Cir. 1985) 779 F.2d 206, 208.

implementation of policies and programs advanced by elected union officials."[18]

We conclude, therefore, Smith was a policymaking employee. For this reason his suit for breach of his employment contract is barred by the LMRDA and the trial court correctly granted defendants' motion for summary judgment on the breach of contract cause of action.

 B. *The LMRDA Does Not Preempt an Action Against a Union by Its Employee Arising out of Discrimination Based on Age or Disability.*

 Relying chiefly on *Thunderburk v. United Food & Commercial Workers' Union*, the union argues Smith's cause of action for wrongful termination in violation of public policy, and by extension his FEHA causes of action for age and disability discrimination, are preempted by the LMRDA's "providing the union with a paramount interest in choosing loyal staff that is motivated to work in furtherance of the union's causes and policies and will not thwart union objectives."[19]

In *Thunderburk*, the plaintiff was terminated from her job as a secretary to union business agents. She filed suit against the union alleging breach of an implied employment contract. Later she sought leave to add a cause of action for wrongful termination in violation of public policy. The trial court granted summary judgment to the union on the breach of contract claim on the ground Thunderburk's complaint was preempted by the LMRDA. The court also denied Thunderburk's motion to amend her complaint to allege wrongful termination in violation of public policy, finding this cause of action was preempted as well.[20]

On appeal, Thunderburk argued the trial court abused its discretion in refusing to allow her to amend her complaint. In the proposed cause of action she asserted she was fired because she supported a ballot initiative (Proposition 226) which prohibited unions from spending a member's dues for political purposes without the member's written consent. Thunderburk's support for Proposition 226, which she made known at work to her fellow employees, was contrary to the position of the union, which opposed the initiative and campaigned to defeat it. Thunderburk alleged terminating her

 [18]*Screen Extras, supra*, 51 Cal.3d at page 1029.
 [19]*Thunderburk v. United Food & Commercial Workers' Union* (2001) 92 Cal.App.4th 1332, 1346 [112 Cal.Rptr.2d 609] (hereafter *Thunderburk*).
 [20]*Thunderburk, supra*, 92 Cal.App.4th at page 1337.

for supporting Proposition 226 violated the public policy of the state embodied in Labor Code section 1102, which prohibits an employer from discharging an employee for refusing to follow "any particular course or line of political action or political activity."[21]

The Court of Appeal upheld the trial court's ruling denying Thunderburk leave to amend the complaint to include the above allegations. The court held the union "had an unrestricted right to discharge plaintiff despite California's legislation prohibiting termination based on an employee's political activities."[22]

The union reads the holding in *Thunderburk* as establishing a broad rule all employment-related tort claims against a union and its elected officials are preempted by the LMRDA in order to ensure union democracy.

Adopting the union's view of LMRDA preemption would have ramifications far beyond upholding "the ability of an elected union president to select his own administrators."[23] Consider:

One of the seminal California cases establishing the tort of wrongful termination in violation of public policy was brought by Peter Petermann, a union business agent, who was fired for disobeying his supervisor's instruction to lie in the testimony he gave before a California legislative committee.[24] Reversing a judgment for the union on Petermann's complaint for wrongful discharge our Supreme Court stated: "To hold that one's continued employment could be made contingent upon his commission of a felonious act at the instance of his employer would be to encourage criminal conduct upon the part of both the employee and employer and serve to contaminate the honest administration of public affairs. This is patently contrary to the public welfare."[25] It would be ironic indeed if a law enacted to curb "abuses of power by union leadership"[26] was used instead to protect such abuses.

In the same vein, employees could be discharged without recourse for blowing the whistle on bribery, kickbacks, embezzlement and tax evasion.[27] If the LMRDA preempts a union employee's cause of action for wrongful

[21]*Thunderburk, supra,* 92 Cal.App.4th at pages 1343-1344.
[22]*Thunderburk, supra,* 92 Cal.App.4th at page 1346.
[23]*Finnegan, supra,* 456 U.S. at page 441 [102 S.Ct. at page 1873].
[24]*Petermann v. International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184, 187 [344 P.2d 25] (hereafter *Petermann*).
[25]*Petermann, supra,* 174 Cal.App.2d at page 189.
[26]*Screen Extras, supra,* 51 Cal.3d at page 1024.
[27]*Collier v. Superior Court* (1991) 228 Cal.App.3d 1117, 1123 [279 Cal.Rptr. 453].

discharge in violation of public policy, the deterrent effect of such a suit is lost "and nothing prevents unscrupulous employers from forcing employees to choose between committing crimes and losing their jobs."[28]

Furthermore, employees would be at the mercy of their supervisors' unwanted sexual advances. Suppose, for example, Thunderburk had alleged she was fired in retaliation for refusing to engage in sexual relations with an elected union official. Under defendants' interpretation of the law, her wrongful discharge claim would be preempted because the elected official was entitled to "loyalty" from his confidential staff.

We find nothing in the holdings in *Thunderburk, Screen Extras, Finnegan* or any other case which supports the interpretation of the LMRDA urged by the union. We find persuasive authority which rejects it.

*Thunderburk* is readily distinguishable from the case before us. In *Thunderburk*, the court did not deny the plaintiff leave to amend her complaint because it believed lawsuits challenging termination in violation of public policy were inherently inconsistent with the goal of the LMRDA to ensure unions are democratically governed. Rather, the court found a direct conflict between the state public policy at issue—an employee's right to follow her own line of political views and activities—and the union's right to employ policymaking staff which shared the political views of its leadership. In explaining why the plaintiff could not allege a cause of action for wrongful termination in violation of her right to free political expression the court stated: "A conflict exists between the public policy set forth in the state legislation [Labor Code sections 1101-1102], which forms the basis of plaintiff's proposed cause of action, and the right of union officials under the LMRDA to freely ' "chose a staff whose views are compatible with his own" . . . "to select his own administrators" as a way of "ensuring a union administrator's responsiveness to the mandate of the union election." ' "[29]

Clearly, when promoting the public policy of a state comes into direct conflict with a federal statute, the state's policy must give way.[30] This is what happened in another case relied on by the union, *Aalgaard v. Merchants Nat. Bank, Inc.*[31] In *Aalgaard*, the court affirmed a summary judgment for the bank in an action by a discharged cashier for age discrimination in violation

---

[28]*Bloom v. General Truck Drivers* (9th Cir. 1986) 783 F.2d 1356, 1361.

[29]*Thunderburk, supra*, 92 Cal.App.4th at page 1345, footnotes omitted.

[30]United States Constitution, Article VI, section 2.

[31]*Aalgaard v. Merchants Nat. Bank, Inc.* (1990) 224 Cal.App.3d 674 [274 Cal.Rptr. 81] (hereafter *Aalgaard*).

of FEHA.[32] The court held the plaintiff's action was preempted by section 24 of the National Bank Act, which provides in relevant part the directors of a national bank are empowered to " 'dismiss [designated] officers or any of them at pleasure, . . .' "[33]

Our Supreme Court's decision in *Screen Extras* is of no assistance to the union. *Screen Extras* was a "garden-variety" wrongful termination action which had nothing to do with union policy or politics or public policies of the state. Therefore, the court did not address the issue before us in the present case.[34] It is true the majority opinion expressed agreement with the view of one of the dissenters "the attempt to decide whether particular wrongful discharge claims do or do not implicate the LMRDA is unworkable."[35] What troubled the majority, however, was not trying to distinguish between cases involving "garden-variety" claims of wrongful termination and claims of wrongful termination in violation of public policy but trying to distinguish between cases involving "garden-variety" discharges and "patronage" discharges.[36] As we explain below this is not a concern in cases involving wrongful discharge in violation of public policies based on FEHA.

Two jurisdictions have confronted the issue whether the LMRDA preempts suits challenging termination in violation of public policy. Both have ruled against preemption. We find the reasoning by the Ninth Circuit Court of Appeals in *Bloom v. General Truck Drivers*[37] particularly persuasive.

In *Bloom*, a business agent fired by his union sued for wrongful termination in violation of public policy alleging he was terminated for refusing to falsify minutes of a meeting to cover up embezzlement. The Court of Appeals held: "The kind of discharge alleged, retaliation for refusal to commit a crime and breach a trust, is not the kind sanctioned by the Act . . . ."[38]

In reaching its decision the court noted the LMRDA itself saved from preemption the responsibilities imposed on union officials by state law.[39] The act provides in relevant part: "Except as explicitly provided to the

---

[32]Government Code section 12941.

[33]*Aalgaard, supra,* 224 Cal.App.3d at page 688.

[34]See *Screen Extras, supra,* 51 Cal.3d at pages 1026, footnotes 6 and 7, 1027.

[35]*Screen Extras, supra,* 51 Cal.3d at page 1027; and see *id.* at page 1036, footnote 2 (dis. opn. of Eagleson, J.). Justice Eagleson would have solved the problem by rejecting the preemption rationale altogether. (*Id.* at p. 1033.)

[36]*Screen Extras, supra,* 51 Cal.3d at pages 1027-1028.

[37]*Bloom v. General Truck Drivers, supra,* 783 F.2d at pages 1360-1362 (hereafter *Bloom*).

[38]*Bloom, supra,* 783 F.2d at page 1362.

[39]*Bloom, supra,* 783 F.2d at page 1361.

contrary, nothing in this chapter shall reduce or limit the responsibilities of any labor organization or any officer . . . of a labor organization . . . under the laws of any State . . . ."[40] The court reasoned the continued vitality of state statutes covered by this savings clause "logically implies the continued vitality of the state's means of enforcing those statutes, including, as here, a cause of action for wrongful discharge for refusal to acquiesce or abet in the statutes' violation."[41]

The court also concluded recognizing a union employee's right not to be fired for refusing to perform a criminal act would not interfere at all with the federal interest in promoting union democracy. "Protecting such a discharge by preempting a state cause of action based on it does nothing to serve union democracy or the rights of union members; it serves only to encourage and conceal such criminal acts and coercion by union leaders."[42]

Finally, the court found allowing the state cause of action "actually advances" federal policy.[43] The court observed title V of the LMRDA "prohibits the very acts of embezzlement and imposes the very fiduciary duties addressed by state law and alleged here by Bloom."[44]

The court concluded: "Where, as here, a union employee bases a wrongful discharge action on allegations that he was fired for refusing to violate state law, that cause of action is not preempted by the federal labor policies reflected in the LMRDA or *Finnegan v. Leu*."[45]

The Colorado Court of Appeal followed *Bloom* in a case in which a discharged assistant business manager claimed he was fired because he uncovered illegal, wrongful, and questionable practices by the union's business manager, refused to vote the way the business manager wanted him to in a union election and expressed objection to the business manager's forcing other employees to vote a certain way.[46] The court held a suit based on the latter two grounds for discharge was preempted by the LMRDA but, under the reasoning in *Bloom*, the plaintiff could challenge his discharge for refusing to aid his superior in the embezzlement of funds from a labor

---

[40]Title 29 United States Code section 523(a).

[41]*Bloom, supra*, 783 F.2d at page 1361.

[42]*Bloom, supra*, 783 F.2d at page 1362.

[43]*Bloom, supra*, 783 F.2d at page 1362.

[44]*Bloom, supra*, 783 F.2d at page 1362.

[45]*Bloom, supra*, 783 F.2d at page 1362. See discussion of *Finnegan* at footnotes 5 and 9, *ante*.

[46]*Montoya v. Local Union III of I.B.E.W.* (Colo.Ct.App. 1988) 755 P.2d 1221, 1223 (hereafter *Montoya*).

organization, a crime under federal and Colorado law.[47] The court expressed confidence that on remand the trial court would be able to limit the introduction at trial of any evidence the plaintiff's political views differed from those of his supervisor, to make sure the supervisor's legitimate prerogatives under the LMRDA were not made an issue in the action for wrongful termination in violation of public policy.[48]

We believe Smith's causes of action for wrongful discharge in violation of public policy and age and disability discrimination fall outside the class of actions preempted by the LMRDA.

Generally speaking, California law imposes a responsibility on employers, including unions, to refrain from discharging an employee on the basis of physical handicap, medical condition or age over 40.[49] In addition, the law imposes an affirmative duty on employers "to make reasonable accommodation for the known physical or mental disability of an . . . employee."[50] Because the LMRDA does not "explicitly provide[] to the contrary," these responsibilities are neither "reduced" nor "limited" by the provisions of the act.[51] As a logical corollary, neither are the state's means of enforcing these responsibilities reduced or limited by the act.[52] Therefore, the LMRDA does not preempt an action against a union for unlawful discharge based on age or disability or for failing to accommodate a disability.

Furthermore, unlike the claim in *Thunderburk*, there is no direct conflict between federal law and the public policies allegedly violated by the union in the present case. Nothing in the LMRDA even remotely condones the practice of age or disability discrimination on the part of elected union officials nor does Kropke contend he was elected to carry out a policy of discrimination against employees who are over the age of 40 or disabled.

Finally, courts need not be concerned about "patronage" suits masquerading as suits for wrongful discharge based on age or disability.[53] We have difficulty envisioning union staff members lying about their age or feigning disability in order to create obstacles to the implementation of union policies

[47]*Montoya, supra*, 755 P.2d at page 1224.
[48]*Montoya, supra*, 755 P.2d at page 1224.
[49]Government Code section 12940, subdivision (a).
[50]Government Code section 12940, subdivision (m).
[51]See 29 United States Code section 523(a).
[52]*Bloom, supra*, 783 F.2d at page 1361.
[53]Compare *Screen Extras, supra*, 51 Cal.3d at pages 1027-1028 (concern over "patronage" suits brought as "garden-variety" breach of contract suits through clever pleading).

adopted by elected union officials.[54] Furthermore, unlike a garden-variety breach of contract case, discharge based on patronage is an affirmative defense to an action alleging age or disability discrimination.[55]

For the reasons set forth above, we hold the LMRDA does not preempt an action against a union by a union employee arising out of job discrimination based on age or disability.

II. *Triable Issues of Fact Exist as to Whether Smith Was Wrongfully Discharged Based on Disability.*

When there is no direct evidence an employee's discharge was the result of unlawful discrimination based on disability, the employee must establish a prima facie case of discrimination, after which the employer must rebut with evidence of legitimate, nondiscriminatory grounds for the discharge, following which the plaintiff bears the burden of establishing the employer's grounds are a pretext or the employer acted with a discriminatory motive.[56]

Defendants' motion for summary judgment did not attack Smith's ability to establish a prima facie case of disability discrimination in his discharge. Rather, defendants argued Smith's complaint failed to allege the necessary facts to establish disability discrimination and, even if it did, defendants established a bona fide, legitimate basis for Smith's discharge—disloyalty to the union administration.

We reject defendants' attack on the complaint. Even assuming defendants could make a "speaking" motion for judgment on the pleadings as part of their motion for summary judgment, the motion is untimely. Defendants already attacked the complaint twice: once by demurrer and once by motion for judgment on the pleadings. They could have raised their objection to the disability discrimination cause of action either time but failed to do so. Furthermore, we find the complaint is sufficient to state a cause of action for disability discrimination on the theories of wrongful discharge and failure to accommodate. Even if the complaint was insufficient, Smith would be entitled to an opportunity to amend it and it is clear from the facts presented on the summary judgment motion he could do so.[57]

In defense of the wrongful discharge claim, defendants rely on the patronage defense discussed at length in part I, *ante*.

---

[54]Compare *Screen Extras, supra*, 51 Cal.3d at page 1028.

[55]See *Guz, supra*, 24 Cal.4th at pages 355-356 (employer may rebut prima facie showing of discrimination with evidence action taken for legitimate, nondiscriminatory reason).

[56]*Guz, supra*, 24 Cal.4th at pages 355-356.

[57]*Hobson v. Raychem Corp.* (1999) 73 Cal.App.4th 614, 625 [86 Cal.Rptr.2d 497].

According to Kropke, he called Smith into his office and "demanded" Smith publicly announce to the staff he would not be a candidate for Kropke's job in the next election, and he would "wholeheartedly" support Kropke in that election. Smith replied such a declaration of support was "premature" and it was unfair of Kropke to make such a demand. Kropke told Smith he had until the following morning to reconsider and if he did not agree to Kropke's demands he would be terminated. When Kropke and Smith met the next morning Smith continued to refuse to announce he would not be a candidate for business manager and would support Kropke. Smith went further, telling Kropke he was not prepared to give him even a private pledge of support. As a consequence, Kropke fired Smith.

Smith's testimony disputes Kropke's in material respects. Smith admits Kropke demanded he publicly announce his loyalty to Kropke's administration but denies Kropke demanded a public announcement of Smith's non-candidacy after Smith told Kropke he had no intention of running for the business manager position. Smith also asserts Kropke told him in the first meeting he needed to build up a "war chest" for the coming election and Smith needed to contribute "his share." According to Smith, it was this demand for money, not the demand for loyalty, which Smith told Kropke was "unfair" in light of his recent injuries and two months without pay.[58] Kropke told Smith he had until the next day to tell Kropke his intentions. Smith states when he and Kropke met the next morning the subjects of Smith's candidacy for business manager, pledge of loyalty to Kropke, and contribution to Kropke's campaign fund never came up. Instead, Kropke told Smith: "I'm letting you go. It's for your own good. What you need to do is rest and recuperate and look out for your family. . . . I know it's hard on you guys asking you to work 60-80 hours per week, but it's much harder nowadays than in the past and it's much easier on young guys." Kropke also told Smith these long hours would be "detrimental to your health" and "you aren't getting any younger; in fact you are older than I am."

Smith also submitted excerpts from Kropke's deposition in which Kropke admitted for approximately a year he had been hearing rumors Smith was planning to run for business manager at the next election but did nothing about those rumors until the meeting with Smith described above. Kropke contends he acted when he did because he heard reports Smith had recently spoken at a union meeting in a way which suggested he was planning to run for office. It is undisputed, however, the meeting between Kropke and Smith took place just a few weeks after Smith returned to work following his accident.

---

[58]When asked at his deposition about his demand Smith contribute to his election campaign Kropke refused to answer, invoking his Fifth Amendment privilege against self-incrimination.

 An employee may raise a triable issue of fact as to the truthfulness of the employer's asserted reason for his discharge with evidence of the implausibilities, inconsistencies or contradictions in the proffered reason, or with direct evidence of a discriminatory motive.[59] To successfully raise a triable issue of fact, however, the employee's evidence must do more than raise a "weak suspicion" that discrimination was a likely basis for his termination.[60]

 It appears from Smith's declaration Kropke gave inconsistent reasons for firing him. At their first meeting Kropke demanded certain acts by Smith to demonstrate his loyalty, implying Smith would be fired if he did not comply. At their meeting the following day, Kropke did not wait to find out whether Smith would express his loyalty but fired Smith on the spot, explaining it was for Smith's own good, the organizer job was too hard on Smith and Smith needed to "rest and recuperate." Once this litigation began, Kropke went back to his original premise he terminated Smith for disloyalty.

In addition, we note, Kropke's statements to Smith at the second meeting, if a jury believed he made them, would constitute direct evidence of disability discrimination in firing Smith.

We conclude, therefore, triable issues of fact exist as to whether Smith was wrongfully discharged on the basis of disability. Accordingly, the trial court erred in granting the union's motion for summary judgment on his causes of action for wrongful discharge in violation of public policy and discrimination based on disability.[61] Kropke, however, cannot be held personally liable for these torts so summary judgment was properly granted to him.[62]

III. *Triable Issues of Fact Exist as to Whether Smith Was Wrongfully Denied Accommodation for His Disability.*

 An employer's failure "to make reasonable accommodation for the known physical or mental disability of an . . . employee" is an independently actionable unlawful business practice under FEHA.[63]

---

[59] *Guz, supra,* 24 Cal.4th at pages 356, 363.

[60] *Guz, supra,* 24 Cal.4th at pages 369-370.

[61] See *City of Moorpark v. Superior Court* (1998) 18 Cal.4th 1143, 1158-1161 [77 Cal.Rptr.2d 445, 959 P.2d 752].

[62] *Reno v. Baird* (1998) 18 Cal.4th 640, 643 [76 Cal.Rptr.2d 499, 957 P.2d 1333].

[63] Government Code section 12940, subdivision (m); *Bagatti v. Department of Rehabilitation* (2002) 97 Cal.App.4th 344 [118 Cal.Rptr.2d 443].

Smith alleges in his complaint, backed up by his declaration in opposition to the motion for summary judgment, defendants not only failed to accommodate his disabilities resulting from the motorhome accident, they affirmatively disaccommodated him by assigning him to a more strenuous job with longer hours and greater stress.

Defendants contend they cannot be held liable for failure to accommodate because Kropke did not know Smith was disabled. Smith's declaration, however, contains ample evidence he not only told Kropke but also his immediate supervisor, Ted Clinton, about the nature of his disabilities and that it was "impossible" for him to work the 60- to 80-hour weeks being demanded of the union's organizers.[64]

Thus we find triable issues of fact exist as to Smith's cause of action for disability discrimination on the theory of failure to accommodate and reverse the trial court's judgment for the union on this claim. Again, however, Kropke cannot be held personally liable on this cause of action so we will affirm the judgment as to him.[65]

IV. *Defendants Showed Smith Cannot Establish a Prima Facie Case of Age Discrimination Nor Rebut Defendants' Proffered Basis for Termination with Evidence the Termination Was Motivated by Age Bias.*

In order to establish a prima facie case of age discrimination in termination from employment the plaintiff must establish, inter alia, he was performing satisfactorily at the time of termination and he was replaced in his position by a significantly younger person.[66]

Smith's own evidence calls into question his ability to show he was performing satisfactorily as an organizer. He admits that during his approximately three weeks on the job he basically just "tagged along" with other organizers because he was not in physical condition to do some of the things organizers normally do. He also told Ted Clinton, his immediate supervisor, it would be "impossible" for him to work the new 60- to 80-hour week being imposed on the union's organizers. Indeed, Smith's claim of disability discrimination is based on the assertion he could *not* satisfactorily perform as an organizer or at least not without accommodations, which were not forthcoming. On the other hand, defendants produced no evidence of any complaints about Smith's performance as an organizer.

---

[64]See Facts and Proceedings Below, *ante.*
[65]See text accompanying footnote 61, *ante.*
[66]*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1116 [94 Cal.Rptr.2d 579].

But even leaving the performance issue aside, defendants produced undisputed evidence after Smith was terminated he was not replaced by a "significantly younger" organizer. Defendants' evidence showed no particular person replaced Smith. Instead, his duties were divided among the remaining organizers. Smith did not counter this evidence with evidence showing he was replaced by a specific individual. Furthermore, the evidence showed between June 1997, when Kropke was elected business manager, and October 2000, the union hired 13 organizers (not counting Smith). Six of these thirteen were over the age of 40 when hired. The youngest was 31 years of age and the oldest was 53.

For these reasons we conclude defendants were entitled to summary judgment on Smith's cause of action for age discrimination. In addition, Kropke was entitled to summary judgment for the reason explained in part II, *ante*.[67]

## V. Smith's Causes of Action for Intentional and Negligent Infliction of Emotional Distress Are Not Barred by the Workers' Compensation Act.

 Where, as here, the plaintiff's emotional distress claims are based on his employer's violation of fundamental public policies of this state, such misconduct cannot be considered a normal part of the employment relationship and the plaintiff's remedy is not confined to workers' compensation.[68]

The trial court erred in granting summary judgment to the union on the emotional distress causes of action.

However, because the emotional distress claims arise out of conduct for which Kropke cannot be held personally liable it follows he cannot be held liable for the emotional distress claims either. On that basis we affirm the judgment for Kropke.

### DISPOSITION

The judgment is affirmed as to both defendants on the cause of action for breach of contract and as to defendant Kropke on the causes of action for intentional and negligent infliction of emotional distress, wrongful discharge in violation of public policy and age and disability discrimination. The judgment is affirmed as to the union on the cause of action for age discrimination and reversed on the causes of action for wrongful discharge in

---

[67]See text accompanying footnote 61, *ante.*

[68]*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1100 [4 Cal.Rptr.2d 874, 824 P.2d 680]; *Cabesuela v. Browning-Ferris Industries of California, Inc.* (1998) 68 Cal.App.4th 101, 112-113 [80 Cal.Rptr.2d 60].

public policy, disability discrimination and intentional and ...fliction of emotional distress. Appellant is awarded his costs on a...

W... J., and Munoz, J.,* concurred.

A petition for a rehearing was denied July 24, 2003, and respondents' petition for review by the Supreme Court was denied September 24, 2003.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.